UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

| | | |
|---|---|---|
| JOHN J. FIERO and FIERO BROTHERS, INC., | : | |
| | : | |
| Plaintiffs and | : | |
| Counterclaim-Defendants, | : | Case No. 08-CV-01298 VM |
| | : | |
| vs. | : | |
| | : | |
| FINANCIAL INDUSTRY REGULATORY | : | |
| AUTHORITY, INC., | : | |
| | : | |
| Defendant and | : | |
| Counterclaimant. | : | |
| | : | |

------------------------------------------------------------X

### DEFENDANT AND COUNTERCLAIMANT FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.'S COUNTERCLAIM AGAINST PLAINTIFFS AND COUNTERCLAIM DEFENDANTS JOHN J. FIERO AND FIERO BROTHERS, INC.

Defendant and Counterclaimant Financial Industry Regulatory Authority, Inc. ("FINRA") (f/k/a National Association of Securities Dealers, Inc. ("NASD"))[1], by and through its undersigned attorney, Terri L. Reicher, files this Counterclaim against Plaintiffs and Counterclaim-Defendants John J. Fiero ("Fiero") and Fiero Brothers, Inc. ("Fiero Brothers"), and in support thereof, states as follows:

### PRELIMINARY STATEMENT

1.    On October 28, 2002, pursuant to an FINRA disciplinary hearing, Fiero and Fiero Brothers, Inc. were fined, jointly and severally, $1,010,809.25 plus interest.

2.    The FINRA decision was affirmed on appeal to the FINRA National Adjudicatory Council ("NAC").

---

[1] On July 30, 2007, FINRA adopted its present corporate name. For purposes of this case, FINRA will refer to itself as FINRA, except where the NASD name appears in a title, a case caption or a quotation.

3.      FINRA has diligently pursued Fiero and Fiero Brothers to collect this fine.

4.      To date, Fiero and Fiero Brothers have refused to pay this fine.

**JURISDICTION AND VENUE**

5.      Jurisdiction rests with this Court pursuant to 28 U.S.C. § 1331 in that the subject matter of this suit arises from the laws of the United States.  Specifically, the New York Court of Appeals found that federal courts have exclusive jurisdiction, under section 27 of the Exchange Act (15 U.S.C. § 78aa), over FINRA's enforcement of a penalty imposed as a result of a FINRA disciplinary proceeding.

6.      As a result of the New York Court of Appeals' decision that federal courts have exclusive jurisdiction over FINRA's collection efforts, FINRA now files its Counterclaim for $1,010,809.25 plus interest in this Court.

7.      Jurisdiction also rests with this Court pursuant to 28 U.S.C. § 1332 in that there is diversity between the parties to this litigation and the costs in controversy exceed $75,000.

8.      FINRA's principal place of business is Washington D.C.

9.      Fiero is, upon information and belief, a resident of Florida.

10.     Fiero Brothers is a domestic corporation located in New York, New York.

11.     Venue is proper here pursuant to 28 U.S.C. §1391(b)(2).

**PARTIES**

12.     FINRA (f/k/a NASD), a private not-for-profit Delaware corporation, is a self-regulatory organization registered with the SEC as a national securities association pursuant to the Maloney Act of 1938, 15 U.S.C. §§ 78a, *et seq*.

13.    Among its other responsibilities, FINRA investigates and commences disciplinary proceedings against FINRA member firms and their associated member representatives relating to compliance with the federal securities laws and regulations, and with FINRA rules.

14.    Fiero was registered with FINRA as a general securities representative and is the sole owner of Fiero Brothers.

15.    Fiero Brothers was registered with FINRA at all times relevant to the facts underlying FINRA's Counterclaim.

## **FACTS**

### Contract

16.    As a condition of registration, Fiero executed and filed a U4 Application on August 15, 1990.  (A redacted copy of the U4 Application is attached as Exhibit A).

17.    By executing the U4, Fiero explicitly agreed to "be subject to and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by [FINRA], subject to right of appeal or review as provided by law."  Exhibit A.

18.    As a condition of registration, Fiero Brothers filed Form BD, dated August 15, 1990.  (A redacted copy of Fiero Brothers' Form BD is attached as Exhibit B).

19.    By executing this Form BD, Fiero Brothers agreed to be subject to FINRA's regulations and disciplinary authority, including the rules relating to sanctions, fines and the obligations to pay them.  Pursuant to the U4, Fiero specifically agreed to "comply with" all "penalties" imposed by FINRA.  Exhibit A.

### FINRA Hearing

20.    On February 6, 1998, FINRA's Department of Enforcement filed a disciplinary  complaint against Fiero and Fiero Brothers alleging that they had engaged in a "bear raid" to drive down the price of securities underwritten by another FINRA member, causing that firm and its clearing firm to collapse while generating significant profits for Fiero and Fiero Brothers.

21.    From October 4, 1999 to October 14, 1999, a FINRA Hearing Panel held a disciplinary hearing on the allegations against Fiero and Fiero Brothers.

22.    The disciplinary hearing against Fiero and Fiero Brothers was conducted in the City of New York.

23.    On December 6, 2000, the Hearing Panel issued a Decision finding that Fiero and Fiero Brothers had violated section 10(b) of the Exchange Act (15 USC § 78j(b)), SEC Rule 10b-5, and NASD Rules 2120 and 2110.

24.    Based on their findings, the Hearing Panel ordered the following sanctions: 1) Fiero Brothers was expelled from FINRA membership; 2) Fiero was barred from associating with any FINRA member firm in any capacity; 3) Fiero and Fiero Brothers were fined, jointly and severally, $1 million; and 4) hearing costs totaling $10,809.25 were imposed.

FINRA Appeal

25.     Fiero and Fiero Brothers appealed the Hearing Panel's Decision to FINRA's National Adjudicatory Council, which affirmed the Hearing Panel's findings and upheld its sanctions in a decision dated October 28, 2002.  (A copy of the October 28, 2002 National Adjudicatory Council's Decision affirming the Hearing Panel's Decision is attached as Exhibit C).

26.     In affirming the Hearing Panel's Decision, the NAC found that Fiero and Fiero Brothers' misconduct "violated the public trust and jeopardized market integrity" and that the "egregiousness" of their conduct warranted the sanctions they received.  (See p. 47 of Exhibit C).

27.     Fiero and Fiero Brothers could have, but chose not to further appeal FINRA's final disciplinary disposition to the SEC.  15 U.S.C. § 78s(d).  If dissatisfied with the SEC's final order, Fiero and Fiero Brothers could have then appealed to the United States Court of Appeals.  15 U.S.C. § 78y(a).

State Court Proceedings

28.     In February of 2004, FINRA brought an action in the Supreme Court of the State of New York seeking to collect the fine and costs levied against Fiero and Fiero Brothers in the amount of $1,010,809.25 plus interest, costs and disbursements.

29.     On May 11, 2006, the Supreme Court of the State of New York granted FINRA's Motion for Summary Judgment and awarded FINRA more than $1.3 million in fines, costs and interest.

30.     Fiero and Fiero Brothers appealed the Supreme Court of the State of New York's order and judgment granting FINRA summary judgment.

31.     On October 26, 2006, the Appellate Division, First Department unanimously affirmed the lower court's order granting FINRA summary judgment.

32.     Fiero and Fiero Brothers appealed the First Department's order to the New York Court of Appeals.

33.     On February 7, 2008, the New York Court of Appeals reversed the First Department's order on the sole ground that state courts "do not have subject matter jurisdiction over this lawsuit." The New York Court of Appeals found that Section 27 of the Exchange Act vests federal courts with exclusive jurisdiction of violations of the Act or the rules and regulations – including FINRA's action to enforce the penalties imposed on Fiero and Fiero Brothers.

## BREACH OF CONTRACT CLAIM

34.     In support of its Counterclaim for breach of contract, FINRA incorporates, by reference, Paragraphs 1 – 33 above.

35.     Fiero and Fiero Brothers executed SEC-approved registration forms in which they expressly agreed to comply with all FINRA rules, including the imposition of fines, penalties and sanctions and the obligations to pay those fines. (*See* Exhibits A and B).

36.     Fiero admits that he "was subject to the regulations and discipline of NASD by reason of his employment and activities in the securities industry and by his execution and filing of a U4 application dated August 15, 1990."  Complaint, ¶ 13.

37.     Fiero Brothers admits that it "was subject to the regulations and discipline of NASD by reason of its filing of forms BD dated August 15, 1990 and March 20, 1992." Complaint, ¶  14.

38.     Pursuant to a FINRA disciplinary hearing and the NAC's October 28, 2002 Decision affirming the Hearing Panel's Decision, Fiero and Fiero Brothers, Inc. were fined, jointly and severally, $1,010,809.25, plus interest. (*See* Exhibit C).

39.     The $1,010,809.25 fine and costs imposed by FINRA constitutes a "penalty" with which Fiero and Fiero Brothers agreed to comply as a condition of their securities industry registration.

40.     The Fieros have failed to pay this fine, notwithstanding FINRA's diligent pursuit of Fiero and Fiero Brothers to collect this fine.

41.     To date, Fiero and Fiero Brothers have refused and continue to refuse to pay this fine, although due and duly demanded.

42.     By failing to pay the fine, Fiero and Fiero Brothers have breached their contract with FINRA to comply with FINRA rules, including those relating to the payment of fines imposed in FINRA disciplinary proceedings.

43.     Their breach of contract has caused damages to FINRA in the amount of $1,010,809.15, plus interest from December 2, 2002.

44.     Fiero and Fiero Brothers owe FINRA, jointly and severally, $1,010,809.15, plus interest from December 2, 2002.

WHEREFORE, FINRA prays for the following relief:

1.     That judgment be entered in favor of FINRA and against Fiero and Fiero Brothers, jointly and severally;

2.     That FINRA be awarded its costs and expenses of suit;

3.     That FINRA be awarded prejudgment interest and interest on the amount of judgment at the rate allowed by law; and

4.     For such other and further relief as the Court may deem just and

proper.

Dated:  August 4, 2008

Respectfully submitted,

_____ */s/ Terri L. Reicher* _____
Terri L. Reicher (TR-8260)
Financial Industry Regulatory
Authority, Inc.
1735 K St. NW
Washington DC  20006
(202) 728-8967
(202) 728-8894
terri.reicher@finra.org

One Liberty Plaza
165 Broadway
New York, NY 10007

Attorney for Defendant and
Counterclaimant Financial Industry
Regulatory Authority, Inc.

## CERTIFICATE OF SERVICE

This is to certify that, pursuant to Rule 5 of the Federal Rules of Civil Procedure,

on August 4, 2008, a copy of Defendant and Counterclaimant Financial Industry

Regulatory Authority, Inc.'s Counterclaim against Plaintiffs and Counterclaim

Defendants John J. Fiero and Fiero Brothers, Inc. was served on all counsel of record via

electronic filing.

*/s/  Terri L. Reicher* _____
Terri L. Reicher

# EXHIBIT A

FORM U-4
UNIFORM APPLICATION FOR SECURITIES INDUSTRY REGISTRATION OR TRANSFER
*If there is an amendment to this page, complete only items 13, 14 and the portion to be amended.*

| ① FIRM CRD #  27269 | SOCIAL SECURITY # | APPLICANT'S CRD # |
| FIRM NFA # | | APPLICANT'S NFA # |

## PERSONAL DATA

| ② LAST NAME  Fiero | JR./SR. ETC | FIRST NAME  John | MIDDLE NAME  Joseph | ③ OTHER NAMES KNOWN BY  None |
| ④ DATE OF BIRTH (Month, Day, Year) | ⑤ SEX | HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR |

## RESIDENTIAL HISTORY

⑥ GIVE ALL ADDRESSES FOR THE PAST FIVE YEARS, STARTING WITH CURRENT ADDRESS

| STREET | CITY | STATE | ZIP | FROM month year | TO month year |
|---|---|---|---|---|---|
| 83 Montgomery Street | Jersey City | NJ | 07302 | 8  87 | PRES |
| 92 Union Street | Newark | NJ | 07105 | 1  85 | 7 |
| | | | | | |
| | | | | | |
| | | | | | |

## EMPLOYMENT AND PERSONAL HISTORY

⑦ ACCOUNT FOR ALL TIME FOR THE PAST TEN YEARS. Give all employment experience starting with your previous employer and working back ___ years. Include full and part-time work, self-employment, military service, unemployment and full-time education. (If this page is being filed as part ___ Form BD, start with your present employer instead.)

| | | | FROM month year | TO month year | POSITION HELD |
|---|---|---|---|---|---|
| NAME  Jesup & Lamont Securities Corp. | | | 7  89 | 3  90 | |
| CITY  New York | STATE  NY | | | | Managing Direct |
| NAME  Wien Securities | | | 1  85 | 6  89 | |
| CITY  Jersey City | STATE  NJ | | | | V. P. = Trading |
| NAME  Greentree Securities | | | 8  83 | 12  84 | |
| CITY  Boca Raton | STATE  Fl | | | | Assistant Trader OTC |
| NAME  Florida Atlantic Univ. | | | 7  81 | 4  83 | |
| CITY  Boca Raton | STATE  Fl | | | | Student |
| NAME | | | | | |
| CITY | STATE | | | | |
| NAME | | | | | |
| CITY | STATE | | | | |
| NAME | | | | | |
| CITY | STATE | | | | |
| NAME | | | | | |
| CITY | STATE | | | | |
| NAME | | | | | |
| CITY | STATE | | | | |
| NAME | | | | | |
| CITY | STATE | | | | |
| NAME | | | | | |
| CITY | STATE | | | | |

⑧ Are you currently engaged in any other business (not shown above) either as a proprietor, partner, officer, director, trustee, employee, agent or otherwise
☐ YES  ☒ NO  If "YES", please explain below

The appropriate signatory area *DOES NOT* have to be completed *UNLESS* this page is being submitted as an amendment.

8  15  9
MONTH  DAY  YEAR        SIGNATURE OF APPROPRIATE SIGNATORY

John Fiero

FORM U-4
UNIFORM APPLICATION FOR SECURITIES INDUSTRY REGISTRATION OR TRANSFER
*If there is an amendment to this page, complete only Item 21 and Items being amended*

FIRM ID #     SOCIAL SECURITY #     APPLICANT'S

FIRM NFA #     27269     APPLICANT'S NFA #

**IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IS "YES", ATTACH COMPLETE DETAILS**

22 **DEFINITIONS**
- **Charged** — Accused of a crime in a formal complaint, Information, or indictment.
- **Investment or Investment-Related** — Pertaining to securities, commodities, banking, insurance, or real estate (including but not limited to acting as or being associated with a broker-dealer, investment company, investment adviser, futures sponsor, bank, or savings and loan association).
- **Involved** — Doing an act or aiding, abetting, counseling, commanding, inducing, conspiring with or failing reasonably to supervise another in doing an

| | | YES | NO |
|---|---|---|---|
| 22A | Have you been convicted of or plead guilty or nolo contendere ("no contest") to | | |
| | (1) a felony or misdemeanor involving investments or an investment-related business, fraud, false statements or omissions, wrongful taking of property, or bribery, forgery, counterfeiting or extortion? | ☐ | ☒ |
| | (2) gambling? | ☐ | ☒ |
| | (3) any other felony? | ☐ | ☒ |
| B | Have you, or an organization over which you exercised management or policy control, ever been charged with any felony or charged with a misdemeanor specified in question A(1) or (2)? | ☐ | ☒ |
| C | Has any court ever: | | |
| | (1) enjoined you in connection with any investment-related activity? | ☐ | ☒ |
| | (2) found that you were involved in a violation of investment-related statutes or regulations? | ☐ | ☒ |
| D | Has the U.S. Securities and Exchange Commission or the Commodity Futures Trading Commission ever | | |
| | (1) found you to have made a false statement or omission? | ☐ | ☒ |
| | (2) found you to have been involved in a violation of investment-related regulations or statutes? | ☐ | ☒ |
| | (3) found you to have been a cause of an investment-related business having its authorization to do business denied, suspended, revoked, or restricted? | ☐ | ☒ |
| | (4) entered an order denying, suspending or revoking your registration or disciplined you by restricting your activities? | ☐ | ☒ |
| E | Has any other Federal regulatory agency or any state regulatory agency ever: | | |
| | (1) found you to have made a false statement or omission or been dishonest, unfair or unethical? | ☐ | ☒ |
| | (2) found you to have been involved in a violation of investment regulations or statutes? | ☐ | ☒ |
| | (3) found you to have been a cause of an investment-related business having its authorization to do business denied, suspended, revoked, or restricted? | ☐ | ☒ |
| | (4) entered an order against you in connection with investment-related activity? | ☐ | ☒ |
| | (5) denied, suspended, or revoked your registration or license or otherwise prevented you from associating with an investment-related business or disciplined you by restricting your activities? | ☐ | ☒ |
| | (6) revoked or suspended your license as an attorney, accountant or federal contractor? | ☐ | ☒ |
| F | Has any self-regulatory organization or commodities exchange | | |
| | (1) found you to have made a false statement or omission? | ☐ | ☒ |
| | (2) found you to have been involved in a violation of its rules? | ☐ | ☒ |
| | (3) found you to have been the cause of an investment-related business having its authorization to do business denied, suspended, revoked or restricted? | ☐ | ☒ |
| | (4) disciplined you by expelling or suspending you from membership, barring or suspending your association with its members, or restricting your activities? | ☐ | ☒ |
| G | Has any foreign government, court, regulatory agency, or exchange ever entered an order against you related to investments or fraud? | ☐ | ☒ |
| H | Have you ever been the subject of an investment-related, consumer-initiated complaint or proceeding that | | |
| | (1) alleged compensatory damages of $10,000 or more, fraud, or wrongful taking of property? | ☐ | ☒ |
| | (2) was settled or decided against you for $5,000 or more, or found fraud or the wrongful taking of property? | ☐ | ☒ |
| I. | Are you now the subject of any complaint, investigation, or proceeding that could result in a "yes" answer to parts A-H of this item? | ☐ | ☒ |
| J | Has a bonding company denied, paid out on, or revoked a bond for you? | ☐ | ☒ |
| K | Do you have any unsatisfied judgments or liens against you? | ☐ | ☒ |
| L | Have you or a firm that you exercised management or policy control over, or owned 10% or more of the securities of, failed in business; made a compromise with creditors, filed a bankruptcy petition or been declared bankrupt? | ☐ | ☒ |
| M | Has a broker or dealer firm that you exercised management or policy control over, or owned 10% or more of the securities of, been declared bankrupt, had a trustee appointed under the Securities Investor Protection Act, or had a direct payment procedure initiated? | ☐ | ☒ |
| N | Have you been discharged or permitted to resign because you were accused of | | |
| | (1) violating investment-related statutes, regulations, rules, or industry standards of conduct? | ☐ | ☒ |
| | (2) fraud or the wrongful taking of property? | ☐ | ☒ |
| | (3) failure to supervise in connection with investment-related statutes, regulations, rules or industry standards of conduct? | ☐ | ☒ |

The applicant and appropriate signatory area *DOES NOT* have to be completed *UNLESS* this page is being submitted as an amendment.

MONTH  DAY  YEAR   SIGNATURE OF APPLICANT
*John Fiero*
TYPE OR PRINT NAME OF APPLICANT

MONTH  DAY  YEAR   SIGNATURE OF APPROPRIATE SIGNATORY
*John Fiero*
TYPE OR PRINT NAME OF APPROPRIATE SIGNATORY    CRD USE ONLY

**FORM U-4**
## UNIFORM APPLICATION FOR SECURITIES INDUSTRY REGISTRATION OR TRANSFER
*If there is an amendment to this form, complete only Item 23 and Items being amended*

| ① FIRM CRD # | 27269 | | | APPLICANT'S CRD # |
|---|---|---|---|---|
| FIRM NFA # | | SOCIAL SECURITY # | | APPLICANT'S NFA # |

### ❿ THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY

1. I swear or affirm that I have read and understand the items and instructions on this form and that my answers (including attachments) are true and complete to the best of my knowledge. I understand that I am subject to administrative, civil or criminal penalties if I give false or misleading answers.

2. I apply for registration with the jurisdictions and organizations indicated in Item 10 as may be amended from time to time and, in consideration of the jurisdictions and organizations receiving and considering my application, I submit to the authority of the jurisdictions and organizations and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the jurisdictions and organizations as they are or may be adopted, or amended from time to time. I further agree to be subject to and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by the jurisdictions and organizations, subject to right of appeal or review as provided by law.

3. I agree that neither the jurisdictions or organizations nor any person acting on their behalf shall be liable to me for action taken or omitted to be taken in official capacity or in the scope of employment except as otherwise provided in the statutes, constitutions, certificates of incorporation, by-laws or the rules and regulations of the jurisdictions and organizations.

4. I authorize the jurisdictions and organizations to give any information they may have concerning me to any employer or prospective employer, any federal, state or municipal agency, or any other organization and I release the jurisdictions and organizations and any person acting on their behalf from any and all liability of whatever nature by reason of furnishing such information.

5. I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgement in any court of competent jurisdiction.

6. For the purpose of complying with the laws relating to the offer or sale of securities or commodities in the jurisdictions indicated in Item 10 as may be amended from time to time, I irrevocably appoint the administrator, of each of those jurisdictions, or such other person designated by law, and the successors in such office, my attorney upon whom may be served any notice, process or pleading in any action or proceeding against me arising out of or in connection with the offer or sale of securities or commodities, or out of the violation or alleged violation of the laws of the jurisdictions I consent that any such action or proceeding against me may be commenced in any court of competent jurisdiction and proper venue by service of process upon the appointee as if I were a resident of and had been lawfully served with process in the jurisdiction. I request that a copy of any notice, process or pleading served hereunder be mailed to my current residential address as reflected in this form or any amendment thereto.

7. I consent that notice of any investigation or proceeding by any self-regulatory organization against applicant may be given by personal service or by regular registered or certified mail or confirmed telegram to applicant at his/her most recent business or home address as reflected in this Form U-4 or any amendment thereto, or by leaving notice of the investigation or proceeding at such address.

8. I authorize all of my employers and any other person to furnish to any jurisdiction or organization or any agent acting on its behalf, any information they have, including my creditworthiness, character, ability, business activities, educational background, general reputation, history of my employment and, in the case of former employers, complete reasons for my termination. Moreover, I release each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any of the above information, including that information reported on the Uniform Termination Notice for Securities Industry Registration (Form U-5). I recognize that I may be the subject of an investigative consumer report ordered by the jurisdictions, or organizations with which this application is being filed, and waive any requirement of notification with respect to any investigative consumer report ordered by any such jurisdiction or organization. I understand that I have the right to request complete and accurate disclosure by the jurisdiction or organization of the nature and scope of the requested investigative consumer report.

9. I understand and certify that the representations in this form apply to all employers with whom I seek registration as indicated in Items 4 and 9 of this form. I agree to update this form by causing an amendment to be filed on a timely basis whenever changes occur to answers previously reported. Further, I represent that, to the extent any information previously submitted is not amended, the information provided in this form is currently accurate and complete.

10. If I have become temporarily registered as an agent, I acknowledge that this application for registration with the jurisdictions and organizations indicated in Item 10 is separate and distinct from any temporary registration already obtained with the jurisdictions and organizations. I further understand that my registration may be denied, suspended or revoked under the laws, regulations or rules of the jurisdictions and organizations.

| 8 · 15 · 90 | | |
|---|---|---|
| Month | Day | Year |

**SIGNATURE OF APPLICANT**

John Fiero
**TYPE OR PRINT NAME OF APPLICANT**

### THE FIRM MUST COMPLETE THE FOLLOWING

To the best of my knowledge and belief, the applicant is currently bonded where required, and, at the time of approval, will be familiar with the statute(s), constitution(s), rules and by-laws of the agency, jurisdiction or self-regulatory organization with which this application is being filed, and the rules governing registered persons, and will be fully qualified for the position for which application is being made herein. I agree that, notwithstanding the approval of such agency, jurisdiction or organization which hereby is requested, I will not employ the applicant in the capacity stated herein without first receiving the approval of any authority which may be required by law. This firm has communicated with all of the applicant's previous employers for the past three years (five years for commodities).

| EMPLOYER | NAME OF PERSON CONTACTED | POSITION OF PERSON CONTACTED | EMPLOYED | | CONTACTED | | |
|---|---|---|---|---|---|---|---|
| | | | FROM | TO | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

IN ADDITION, I HAVE TAKEN APPROPRIATE STEPS TO VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN AND WITH THIS APPLICATION.

THE APPROPRIATE SIGNATORY AREA MUST BE COMPLETED ON ALL INITIAL TRANSFER OR AMENDMENT FILINGS.

| 8 · 15 · 90 | | | CRD USE ONLY |
|---|---|---|---|
| MONTH | DAY | YEAR | |

**SIGNATURE OF APPROPRIATE SIGNATORY**

John Fiero
**TYPE OR PRINT NAME OF APPROPRIATE SIGNATORY**

Rev. Form U-4 (4·90)

# EXHIBIT B

# FORM BD

**PAGE 1**
(Execution Page)

UNIFORM APPLICATION FOR BROKER DEALER REGISTRATION

**WARNING** Failure to keep this form current and to file accurate supplemental information on a timely basis, or the failure to keep accurate books and records or otherwise to comply with the provisions of law applying to the conduct of business as a broker dealer would violate the Federal securities laws and the laws of the jurisdictions and may result in disciplinary administrative injunctive or criminal action

**INTENTIONAL MISSTATEMENTS OR OMISSIONS OF FACTS MAY CONSTITUTE CRIMINAL VIOLATIONS**

☒ APPLICATION   ☐ AMENDMENT   FIRM CRD NO. 27269

1  Exact name, principal business address, mailing address, if different, and telephone number of applicant

A   Full name of applicant (If sole proprietor, state last, first, and middle name)      B   IRS Empl Ident No

**Fiero Securities Corp.**     *Applied for*

C   Name under which business is conducted, if different

**N/A**

D   If name of business is hereby amended, state previous name

**N/A**

E   Firm main address

**115 Broadway, Suite 1201**     **New York**     **New York**     **10006**

Mailing Address, if different

**N/A**

F   Telephone Number

**212-587-8800**     G   **John Fiero**

**EXECUTION**  For the purpose of complying with the laws of the State(s) designated in Item 2 relating to either the offer or sale of securities or commodities the undersigned and applicant hereby certify that the applicant is in compliance with applicable state surety bonding requirements and irrevocably appoint the administrator of each of those State(s) or such other person designated by law and the successors in such office, attorney for the applicant in said State(s) upon whom may be served any notice, process or pleading or any action or proceeding against the applicant arising out of or in connection with the offer or sale of securities or commodities or out of the violation or alleged violation of the laws of those State(s) and the applicant hereby consents that any such action or proceedings against the applicant may be commenced in any court of competent jurisdiction and proper venue within said State(s) by service of process upon said appointee with the same effect as if applicant were a resident in said State(s) and had lawfully been served with process in said State(s)

The applicant consents that service of any civil action brought by or notice of any proceeding before the Securities and Exchange Commission or any self-regulatory organization in connection with the applicant's broker-dealer activities, or of any application for a protective decree filed by the Securities Investor Protection Corporation, may be given by registered or certified mail or confirmed telegram to the applicant's contact employee at the main address, or mailing address if different, given in Item 1 G

The undersigned, being first duly sworn, deposes and says that he has executed this form on behalf of and with the authority of said applicant. The undersigned and applicant represent that the information and statements contained herein including exhibits attached hereto and other information filed herewith, all of which are made a part hereof, are current, true and complete. The undersigned and applicant further represent that to the extent any information previously submitted is not amended, such information is currently accurate and complete

**8/15/96**
Date

**FIERO SECURITIES CORP.**
Name of Applicant

By  **John Fiero, President**
Signature and Title

SHERRI ROSEN
Notary Public, State of New York
No. 41-4712214
Qualified in Queens County
Certificate Filed in New York County
Term Expires December 31, 19__

Subscribed and sworn before me this **15** day of **August** 19 **96** by **Sherri Rosen**

My commission expires _____  County of _____  State of _____

*This page must always be completed in full with original, manual signatures and notarization.*
*To amend, circle item(s) being amended*

DO NOT WRITE BELOW THIS LINE   FOR OFFICIAL USE ONLY

**To amend, circle question numbers amended and file with a completed Execution page (Page 1)**

| FORM BD Page 2 | Applicant Name | FIERO SECURITIES CORP. | | OFFICIAL USE |
|---|---|---|---|---|
| | Date | 8/15/90 | Firm CRD No. 27269 | |

2 To be registered with the following (designate) "1" Initial Registration, "2" Pending, "3" Already Registered. If any license, registration or membership listed herein is of a restricted nature, explain fully on Schedule D

☐ SECURITIES & EXCHANGE COMMISSION

**S R O**

| ☐ ASE | ☐ BSE | ☐ CBOE | ☐ CSE | ☐ MSE | ☒ NASD | ☐ NYSE | ☐ PHLX | ☐ PSE | ☐ OTHER (Specify) |
|---|---|---|---|---|---|---|---|---|---|

**J U R I S D I C T I O N**

| ☐ AL | ☐ AK | ☐ AZ | ☐ AR | ☐ CA | ☐ CO | ☐ CT | ☐ DE | ☐ DC | ☐ FL | ☐ GA | ☐ HI | ☐ ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ IL | ☐ IN | ☐ IA | ☐ KS | ☐ KY | ☐ LA | ☐ ME | ☐ MD | ☐ MA | ☐ MI | ☐ MN | ☐ MS | ☐ MO |
| ☐ MT | ☐ NE | ☐ NV | ☐ NH | ☐ NJ | ☐ NM | ☐ NY | ☐ NC | ☐ ND | ☐ OH | ☐ OK | ☐ OR | ☐ PA |
| ☐ RI | ☐ SC | ☐ SD | ☐ TN | ☐ TX | ☐ UT | ☐ VT | ☐ VA | ☐ WV | ☐ WI | ☐ WY | ☐ PR |

3 Date of formation 8/7/90   Applicant's fiscal year ends 9/30   Place of filing New York
(MM/DD/YY)   (MM/DD)

☒ Corporation - Complete Schedule A   ☐ Partnership - Complete Schedule B   ☐ Sole Proprietorship - Complete Schedule C

☐ Other (specify) _____

Complete Schedule C

4 If applicant is a sole proprietor, state full residence address and social security number

N/A

Social Security No. _____

_____  _____  _____  _____
Number and Street   (City)   (State)   (Zip Code)

5 Is applicant a successor to a registered broker-dealer?
If "yes" explain on Schedule D

YES ☐   NO ☒

If "yes" state

A Date of Succession _____

B Full name, IRS Empl. Ident. No., SEC File No. and Firm CRD No. of predecessor broker-dealer

Name _____

IRS Empl. Ident. No. _____   Firm CRD No. _____

SEC File Number _____

A Does any person not named in Item 1 or Schedules A, B or C, directly or indirectly through agreement or otherwise exercise or have the power to exercise control over the management or policies of applicant?

(If "yes" state on Schedule D the exact name of each person (if individual, state last, first and middle names) and describe the agreement or other basis through which such person exercises or has the power to exercise control.)

☐   ☒ X

B Is the business of applicant wholly or partially financed directly or indirectly, by any person not named in Item 1 or Schedules A, B or C, in any manner other than by (1) a public offering of securities made pursuant to the Securities Act of 1933, (2) credit extended in the ordinary course of business by suppliers, banks and others, or a satisfactory subordination agreement as defined in Rule 15c3-1 under the Securities Exchange Act of 1934 (17 CFR §240.15c3-1)?

(If "yes" state on Schedule D the exact name (last, first, middle) of each person and describe the agreement or arrangement through which such financing is made available including the amount thereof.)

YES ☐   NO ☒

*To amend, circle question numbers amended and file with a completed Execution page (Page 1)*

| **FORM BD** Page 3 | Applicant Name | FIERO SECURITIES CORP. | | OFFICIAL USE |
|---|---|---|---|---|
| | Date | 8/15/90 | Firm CRD No 27269 | |

**7  Definitions**

- **Control affiliate** – An individual or firm that directly or indirectly controls, is under common control with, or is controlled by the applicant. Included are any employees identified in Schedules A, B or C of this form as exercising control. Excluded are any employees who perform clerical, administrative, support or similar functions, or who, regardless of title, perform no executive duties or have no senior policy making authority.

- **Investment or investment-related** – Pertaining to securities, commodities, banking, insurance, or real estate (including, but not limited to, acting as or being associated with a broker-dealer, investment company, investment adviser, futures sponsor, bank, or savings and loan association).

- **Involved** – Doing an act or aiding, abetting, counseling, commanding, inducing, conspiring with or failing reasonably to supervise another in doing an act.

A. In the past ten years has the applicant or a control affiliate been convicted of or pleaded guilty or nolo contendere ("no contest") to

   (1) a felony or misdemeanor involving
     investment or an investment-related business,
     fraud, false statements or omissions,
     wrongful taking of property, or
     bribery, forgery counterfeiting or extortion?  **YES ☐  NO ☒**

   (2) any other felony?  **YES ☐  NO ☒**

B. Has any court

   (1) In the past ten years enjoined the applicant or a control affiliate in connection with any investment related activity?  **YES ☐  NO ☒**

   (2) ever found that the applicant or a control affiliate was involved in a violation of investment related statutes or regulations?  **YES ☐  NO ☒**

C. Has the U.S. Securities and Exchange Commission or the Commodity Futures Trading Commission ever

   (1) found the applicant or a control affiliate to have made a false statement or omission?  **YES ☐  NO ☒**

   (2) found the applicant or a control affiliate to have been involved in a violation of its regulations or statutes?  **YES ☐  NO ☒**

   (3) found the applicant or a control affiliate to have been a cause of an investment related business having its authorization to do business denied, suspended, revoked, or restricted?  **YES ☐  NO ☒**

   (4) entered an order denying, suspending or revoking the applicant's or a control affiliate's registration or otherwise disciplined it by restricting its activities?  **YES ☐  NO ☒**

D. Has any other Federal regulatory agency or any state regulatory agency

   (1) ever found the applicant or a control affiliate to have made a false statement or omission or been dishonest, unfair or unethical?  **YES ☐  NO ☒**

   (2) ever found the applicant or a control affiliate to have been involved in a violation of investment regulations or statutes?  **YES ☐  NO ☒**

   (3) ever found the applicant or a control affiliate to have been a cause of an investment related business having its authorization to do business denied, suspended, revoked, or restricted?  **YES ☐  NO ☒**

   (4) in the past ten years entered an order against the applicant or a control affiliate in connection with investment related activity?  **YES ☐  NO ☒**

   (5) ever denied, suspended, or revoked the applicant's or a control affiliate's registration or license, prevented it from associating with an investment related business, or otherwise disciplined it by restricting its activities?  **YES ☐  NO ☒**

   (6) ever revoked or suspended the applicant's or a control affiliate's license as an attorney or accountant?  **YES ☐  NO ☒**

*To amend, circle question numbers amended and file with a completed Execution page (Page 1).*

| **FORM BD** Page 4 | Applicant Name | FIERO SECURITIES CORP. | | OFFICIAL USE |
|---|---|---|---|---|
| | Date | 8/15/90 | Firm CRD No : 27269 | |

E  Has any self-regulatory organization or commodities exchange ever:

    (1)  found the applicant or a control affiliate to have made a false statement or omission?     YES ☐  NO ☒

    (2)  found the applicant or a control affiliate to have been involved in a violation of its rules?     YES ☐  NO ☒

    (3)  found the applicant or a control affiliate to have been the cause of an investment related business having its authorization to do business denied, suspended, revoked or restricted?     YES ☐  NO ☒

    (4)  disciplined the applicant or a control affiliate by expelling or suspending it from membership, by barring or suspending its association with other members, or by otherwise restricting its activities?     YES ☐  NO ☒

F  Has any foreign government, court, regulatory agency, or exchange ever entered an order against the applicant or a control affiliate related to investments or fraud?     YES ☐  NO ☒

G  Is the applicant or a control affiliate now the subject of any proceeding that could result in a "yes" answer to parts A-F of this item?     YES ☐  NO ☒

H  Has a bonding company denied, paid out on, or revoked a bond for the applicant?     YES ☐  NO ☒

I  Does the applicant have any unsatisfied judgments or liens against it?     YES ☐  NO ☒

J  Has the applicant or a control affiliate of the applicant ever been a securities firm or a control affiliate of a securities firm that has been declared bankrupt, had a trustee appointed under the Securities Investor Protection Act, or had a direct payment procedure begun?     YES ☐  NO ☒

### Item 7 Instructions

If a "yes" answer on Item 7 involves

- the applicant broker-dealer, or an individual without a Form U-4 (individual registration) in the CRD, give the details on Schedule D.

- an individual with a Form U-4 (individual registration) in the CRD, attach any necessary Form U-4 amendments to the Form BD. The CRD will update the Forms U-4 and BD.

**For each "yes" to Item 7, give the following details of any court or regulatory action:**

- the broker-dealer and individuals named,
- the title and date of the action,
- the court or body taking the action, and
- a description of the action

8  Does applicant

  A  Have any arrangement with any other person, firm or organization under which

    (1)  Any of the accounts or records of applicant are kept or maintained by such person, firm, or organization?     YES ☐  NO ☒

    (2)  Such other person, firm or organization (other than a bank or satisfactory control location as defined in paragraph (c) of Rule 15c3-3 under the Securities Exchange Act of 1934, 17 CFR §240.15c3-3) holds or maintains funds or securities of applicant or of any of its customers?     YES ☐  NO ☒

  B  Have any arrangements with any other broker or dealer under which applicant refers or introduces customers to such other broker or dealer?     YES ☐  NO ☒

    (If the answer to any question of Item 8 is "yes," furnish as to each such arrangement the full name and principal business address of the other person, firm, or organization  and the summary of each such arrangement on Schedule D.)

9  Does applicant control, is applicant controlled by, or is applicant under common control with, directly or indirectly, any partnership, corporation, or other organization engaged in the securities or investment advisory business?     YES ☐  NO ☒

  (If "yes," state full name and principal business address of such partnership, corporation, or other organization and describe the nature of control on Schedule D. See instructions for definition of control.)

*To amend, circle question numbers amended and file with a completed Execution page (Page 1).*

**FORM BD Page 5**   Applicant Name _____ FIERO SECURITIES CORP. _____   OFFICIAL US

Date __8/15/9c__   Firm CRD No.: __27269__

10 Check types of business engaged in (or to be engaged in, if not yet active) by applicant. Do not check any category which accounts for or is expected to account for less than 10% of annual revenue from the securities or investment advisory business.

A  Exchange member engaged in exchange commission business ............................... ☐ EMC

B  Exchange member engaged in floor activities ........................................ ☐ EMF

C  Broker or dealer making inter-dealer markets in corporate securities over-the-counter .... ☒ IDM

D  Broker or dealer retailing corporate securities over-the-counter ........................ ☐ BDR

E  Underwriter or selling group participant (corporate securities other than mutual funds) ... ☐ USG

F  Mutual fund underwriter or sponsor .................................................. ☐ MFU

G  Mutual fund retailer ............................................................... ☐ MFR

H  1. U.S. government securities dealer ................................................ ☐ GSD

   2  U.S. government securities broker ............................................... ☐ GSB

I  Municipal securities dealer ......................................................... ☐ MSD

J  Municipal securities broker ......................................................... ☐ MSB

K  Broker or dealer selling variable life insurance or annuities ......................... ☐ VLA

L  Solicitor of savings and loan accounts .............................................. ☐ SSL

M  Real estate syndicator .............................................................. ☐ RES

N  Broker or dealer selling oil and gas interests ...................................... ☐ OGI

O  Put and call broker or dealer or option writer ...................................... ☐ PCB

P  Broker or dealer selling securities of only one issuer or associated issuers (other than mutual funds) .... ☐ BIA

Q  Broker or dealer selling securities of non-profit organizations (e.g., churches, hospitals) ............... ☐ NPB

R  Investment advisory services ........................................................ ☐ IAD

S  Broker or dealer selling tax shelters or limited partnerships ....................... ☐ TAP

T  Other (give details on Schedule D) .................................................. ☐ OTH

| | | YES | NO |
|---|---|---|---|
| 11 A | Does applicant effect transactions in commodity futures, commodities or commodity options as a broker for others or dealer for its own account? | ☐ | ☒ |
| B | Does applicant engage in any other non-securities business? (If "yes," describe each other business briefly on Schedule D) | ☐ | ☒ |
| 12 | Is applicant applying for or continuing an existing registration solely as a government securities broker or dealer? | ☐ | ☒ |

13  Notice of Government Securities Activities

| | | YES | NO |
|---|---|---|---|
| A | Is applicant acting or intending to act as a government securities broker or dealer in addition to other broker dealer activities? (Do not answer "YES" if applicant answered "yes" to Question 12.) | ☐ | ☒ |
| B | Is applicant ceasing its activities as a government securities broker or dealer? (Do not answer "YES" unless previously answered "yes" to Question 13A.) | ☐ | ☒ |

*To amend, complete the schedule in full in accordance with the instructions below and file with a completed Execution page (Page 1)*

## Schedule A of FORM BD

(revised 4/87)

### FOR CORPORATIONS

OFFICIAL USE

Applicant Name    **FIERO SECURITIES CORP.**

(Answers in response to ITEM 3 of FORM BD)   Date _____     Firm CRD No. *2726°*

1. This form requests information on the owners and executive officers of the applicant
2. Please complete for:
   A. each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer, director, and individuals with similar status or functions, and
   B. every person who is directly, or indirectly through intermediaries, the beneficial owner of 5% or more of any class of equity security of the applicant
3. If a person covered by 2(B) above owns applicant indirectly through intermediaries, list all intermediaries and below them, if they are not public reporting companies under Sections 12 or 15(d) of the Securities Exchange Act of 1934 but are
   A. corporations, give their shareholders who own 5% or more of a class of equity security, or
   B. partnerships, give their general partners or any limited special partners who have contributed 5% or more of the partnership's capital.
4. If the intermediary's shareholders or partners listed under 3 above are not individuals, continue up the chain of ownership listing their shareholders, general partners, and 5% limited or special partners until individuals are listed.
5. Ownership codes are:   NA - 0 up to 5%         B - 10% up to 25%            D - 50% up to 75%
                           A - 5% up to 10%       C - 25% up to 50%           E - 75% up to 100%
6. Asterisk (*) names reporting a change in title, status, stock ownership, partnership interest, or control   Double asterisk (**) names new on this filing
7. Check "Control Person" column if person has "control" as defined in the instructions to this form
8. Applicants indicating an options business in Item 10 must enter "SROP" for their Senior Registered Options Principal and "CROP" for their Compliance Registered Options Principal in the "Title or Status" column.

| FULL NAME | | | Beginning Date | | Title or Status | Ownership Code | Control Person | CRD Number or, if none, Social Security Number | Off U |
|-----------|-------|--------|----|----|-----------------|----------------|----------------|------------------------------------------------|---|
| Last | First | Middle | Mo | Yr | | | | | |
| Fiero | John | Joseph | | | Pres.,Sec., Dir., FINOP,E CEO, Compl. Dir. | | X | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 0 |
| | | | | | | | | | 1 |
| | | | | | | | | | 1 |
| | | | | | | | | | 1 |

List below the names reported in the most recent previous filing under this item that are being deleted

| FULL NAME | | | Ending Date | | CRD Number or, if none, Social Security Number |
|-----------|-------|--------|----|----|-----------------------------------------------|
| Last | First | Middle | Mo | Yr | |
| | | | | | |
| | | | | | |
| | | | | | |

# EXHIBIT C

1097FD

**Time of Request:** Thursday, July 24, 2008  13:59:00 EST
**Client ID/Project Name:**
**Number of Lines:** 1459
**Job Number:**      1843:105022141

Research Information

**Service:**   Terms and Connectors Search
**Print Request:** Current Document: 17
**Source:** Financial Industry Regulatory Authority (FINRA/NASD)Materials
**Search Terms:** fiero

**Send to:**  NN/L, 107VJQ
           FINANCIAL INDUSTRY REGULATORY AUTHORITY
           1735 K ST NW
           WASHINGTON, DC 20006-1516

17 of 31 DOCUMENTS

Copyright (c) 2002 National Association of Securities Dealers, Inc.

Department of Enforcement, Complainant, vs. John Fiero, Fiero Brothers, Inc.,
Respondents

Complaint No. CAF980002

BEFORE THE NATIONAL ADJUDICATORY COUNCIL
NASD

*2002 NASD Discip. LEXIS 16*

October 28, 2002

**TEXT:**
 [*1]

DECISION

**Firm and its president appeal findings that they, in cooperation with others, manipulated the
market for certain securities and engaged in coercive conduct; and that they violated NASD's
affirmative determination rule. Held, findings affirmed and sanctions of bar, expulsion, and fine
upheld.**

**Appearances**

For the Complainant Department of Enforcement: Robert L. Furst, Esq. and Jonathan I. Golomb, NASD Department of
Enforcement.

For the Respondents John Fiero and Fiero Brothers, Inc.: Martin H. Kaplan and Brian D. Graifman, Gusrae, Kaplan &
Bruno; Martin P. Russo, MPR Law Practice, P.C.; Lewis D. Lowenfels, Tolins & Lowenfels.

**Opinion**

John Fiero ("Fiero") and Fiero Brothers, Inc. ("Fiero Brothers" or "the Firm") (collectively, the "Fiero
Respondents") appeal a December 6, 2000 decision of an NASD Hearing Panel. The Hearing Panel held that the Fiero
Respondents, in cooperation with others and through the use of collusive trading activity, manipulated the market for
certain securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Exchange Act
Rule 10b-5, and Conduct Rules 2110 and 2120 and effected short sales [*2]  of securities without making the
affirmative determinations required by Conduct Rule 3370, in violation of Rules 2110 and 3370.

In summary, the Hearing Panel found that the manipulation violation involved the Fiero Respondents' colluding
with other short sellers to drive down the prices of several small-cap securities. Together, the Fiero Respondents and
other short sellers amassed sizeable short positions with the aim of demonstrating a large demand to sell the
manipulated securities and depress the prices for those securities. Once the Fiero Respondents and the other short sellers
had established significant short positions, one member of the short-selling group negotiated a deal with the firm that
had underwritten the manipulated securities and that held large proprietary positions in the manipulated securities. In
exchange for an agreement that the short selling would stop, the underwriter, under the immense pressure of the

declining stock prices, agreed to sell the short sellers large blocks of the manipulated securities at deeply discounted prices. The short sellers, including the Fiero Respondents, covered their short positions and generated significant profits for themselves. [*3] After covering their short positions, the Fiero Respondents colluded with other short sellers in a second wave of short selling, which eventually led to the demise of the underwriter and its clearing firm.

We affirm the Hearing Panel's findings and bar Fiero from associating with any member firm in any capacity. We expel Fiero Brothers from membership in NASD, jointly and severally fine Fiero and Fiero Brothers $ 1,000,000, and impose costs.

I. FACTS

A. Background

1. The Complaint

On February 6, 1998, NASD's Department of Enforcement ("Enforcement") filed a complaint, naming as respondents Fiero, Fiero Brothers, Stephen Carlson ("Carlson"), former NASD member firm Falcon Trading Group, Inc. ("Falcon"), Mark Iacono ("Iacono"), Robert Sherman ("Sherman"), former NASD member firm Sovereign Equity Management Corp. ("Sovereign"), Glen Vittor, and Greg Vittor.

The complaint alleged that in January and February 1995, the Fiero Respondents, along with Carlson, Falcon, Sovereign, Glen Vittor and others not named as respondents, carried out a "bear raid" n1 in order to manipulate the price of 10 securities underwritten by then-NASD member firm Hanover Sterling & Co., Inc. ("Hanover"). [*4] The complaint alleged that, in carrying out this bear raid, the Fiero Respondents engaged in collusive trading activity and manipulated the market for securities underwritten by Hanover, in violation of Section 10(b) of the Exchange Act, Exchange Act Rule 10b-5, and NASD Conduct Rules 2110 and 2120. The complaint also alleged that the Fiero Respondents violated Rule 3370, which required the Firm to make an affirmative determination as to the availability of the security being sold when Fiero Brothers effected short sales of the securities underwritten by Hanover. n2

n1 In a "bear raid," a manipulator uses short selling as a tool for manipulation. A "short sale" involves a seller agreeing to sell stock it does not own or owns and does not deliver. Generally, in order to deliver the security, the short seller will borrow the security from a broker and pay a fee while it borrows the stock. Eventually, the short seller must "cover" the short sale by returning an equivalent amount of stock to the lender. U.S. v. Russo, 74 F.3d 1383, 1388 (2d Cir. 1996); Short Sales, Exchange Act Rel. No. 42037, 1999 SEC LEXIS 2232 (Oct. 20, 1999). Although short selling may serve useful market purposes, in a bear raid, it is used to manipulate the market for a security. In a bear raid, short sellers attempt to drive down the price of the security by artificially creating an imbalance of sell-side interest. Id.

[*5]

n2 Enforcement dismissed the complaint as to Carlson after determining that he was no longer subject to NASD's jurisdiction. Iacono, Sherman and Greg Vittor entered into settlement agreements. The Hearing Officer issued an order holding respondents Sovereign, Falcon and Glen Vittor in default for failing to participate in a pre-hearing conference. Thereafter, the Hearing Panel conducted a nine-day hearing and issued a decision as to the Fiero Respondents only.

2. The Fiero Respondents' Accomplices In The Manipulative Scheme

In 1995, Carlson owned and operated former NASD member firm Aspen Capital Group, Inc. ("Aspen"). In 1997, our predecessor, the National Business Conduct Committee ("NBCC"), barred Carlson from associating with any

member firm in any capacity for attempting to obtain stock at below-market prices through the use of threats and coercion in June 1994, approximately six months before the events in this proceeding. District Bus. Conduct Comm. for District No. 3 v. Aspen Capital Group, Inc., Complaint No. C3A940064, 1997 NASD Discip. LEXIS 53 (NBCC Sept. 19, 1997), aff'd, Stephen Carlson, 53 S.E.C. 1017 (1998). During the same period, Sherman was head [*6] trader and compliance officer at Aspen.

In 1995, Iacono was associated as trader with former NASD member firm A.T. Brod & Co., Inc. ("Brod"). Iacono was Fiero's friend and former colleague.

In 1995, Glen Vittor was the president of Falcon and Sovereign. At that time, the two firms were located in adjacent offices at the same address. Glen Vittor was the sole owner of Sovereign and a part owner of and the head trader at Falcon. A small group of limited partners -- Tally Group, Ltd. ("Tally"), Rocena, Ltd. ("Rocena") (two Bahamian entities that shared the same Bahamian post office box), JBF and JG -- were the other owners of Falcon. All of Falcon's owners were associated with or related in some way to Philip Gurian ("Gurian"), a key participant in the manipulative scheme who is not a respondent in this matter.

Previously, Gurian had been a registered representative, and he was, at one time, associated with Falcon. In 1991, NASD revoked Gurian's registration for failure to pay a fine imposed in a prior disciplinary proceeding. On March 1, 1995, the NBCC issued a decision holding that Gurian, Glen Vittor, and Falcon had violated NASD Rules by failing to honor trade commitments and by [*7] allowing Gurian, a person whose registration had been revoked, to act in a registered capacity at Falcon. The NBCC barred Gurian from associating with any member firm in any capacity. The NBCC also censured, suspended and fined Falcon, and it censured and fined Glen Vittor, suspended him in all capacities for one year, and barred him in all principal capacities. Market Surveillance Comm. v. Falcon Trading Group, Ltd., Complaint No. CMS940010, 1995 NASD Discip. LEXIS 238 (NBCC Mar. 1, 1995), aff'd, Falcon Trading Group, 52 S.E.C. 554 (1995), aff'd, 102 F.3d 579 (D.C. Cir. 1996).

Although not a respondent, as discussed more fully below, Gurian occupies a central role in this proceeding. Several securities accounts in the names of entities or individuals allegedly involved with Gurian were employed in the bear raid. These include an account at Brod in the name of Roddy DiPrimo, Ltd. ("DiPrimo"), a Bahamian entity, that Fiero's friend Iacono opened and serviced. According to Brod's records, DiPrimo's address was the Bahamian post office box used by Falcon limited partners Tally and Rocena.

3. The Manipulated Securities

In January 1995, Hanover was an NASD member firm. [*8] Hanover had underwritten the 10 securities involved in this proceeding (hereinafter "the Hanover securities"):

. All-Pro Products, Inc. units ("APROU");
. American Toys, Inc. common stock ("ATOY") and warrants ("ATOYZ");
. Envirometrics, Inc. common stock ("EVRM");
. Mr. Jay's Fashions International, Inc. common stock ("MRJY");
. Panax Pharmaceutical Co., Ltd. units ("PANXU");
. Play Co. Toys units ("PLCOU"), common stock ("PLCO"), and warrants ("PLCOW"); and
. Porter McLeod National Retail, Inc. common stock ("PMNR"). n3

n3 The initial public offerings ("IPOs") for these issues were small, ranging from 400,000 units for MRJY to more than one million for PANXU. The IPOs for MRJY and APROU occurred in 1993; the IPOs for ATOY, EVRM, PMNR, PLCOU, PLCO, and PLCOW occurred in 1994.

4. The Parties' Arguments

Enforcement contended that in January and February 1995, the Fiero Respondents and others manipulated the market for the Hanover securities by engaging in a two-stage "bear raid" against the Hanover securities. The first stage ended when the Fiero Respondents and others coerced Hanover to sell to Fiero Brothers large blocks of Hanover securities at deeply discounted prices [*9]  (to cover Fiero Brothers' own short sales and to sell to other short sellers to cover their short sales), and the second stage involved additional short selling that caused the failure of Hanover and its clearing firm, Adler Coleman Clearing Corp. ("Adler Coleman"). Enforcement contended that during both stages of the bear raid, the Fiero Respondents had established large short positions in the Hanover securities through short sales that violated Rule 3370.

The Fiero Respondents denied these charges and contended that Hanover was, itself, engaged in a fraudulent scheme to manipulate the market for the Hanover securities, with the intention of "pumping" the price of the Hanover securities to unjustifiable heights before "dumping" them on gullible purchasers. The Hearing Panel accepted the Fiero Respondents' contention that Hanover fraudulently manipulated the Hanover securities, but ruled that Hanover's manipulation of the securities was not a defense to the allegations of the complaint. The Hearing Panel found violations as alleged in the complaint.

B. The Fiero Respondents

During the relevant period, Fiero was president, sole owner and the only registered employee of Fiero Brothers. [*10]  Fiero does not dispute his responsibility for Fiero Brothers' trading activity during the period at issue. Fiero entered the securities industry in the early 1980s, and he worked at a number of member firms before opening his own firm in the early 1990s, which began under the name Fiero Securities and ultimately became Fiero Brothers. Fiero opened the Firm in 1991 with $ 250,000 in capital from his own savings; by 1995, when the events giving rise to this proceeding occurred, the Firm's capital had increased to approximately $ 9 million, all of which had come from Fiero himself rather than any outside investors.

Fiero Brothers has never had retail customers. Fiero explained that he "always made markets in small cap penny stocks," which he described as "the underbelly to the over-the-counter market." As of the first quarter of 1995, Fiero Brothers made markets in 50 to 60 small cap stocks. Fiero thought "the penny stock market [was] very treacherous" and that "the short side [offered] more rewards," because most penny stock offerings were schemes in which the motive was to increase the price of the stock artificially. Fiero viewed "buy-ins" n4 as part of the ordinary course of business [*11] and simply a bookkeeping function.

n4 A "buy-in" occurs when a seller has not performed its part of a contract for the sale of securities by the date delivery is due, and the buyer, after giving due notice, purchases (or "buys-in") in the open market and for the account and risk of the seller, the securities which were to have been delivered. Nassau Securities Service, 42 S.E.C. 445 (1964).

Fiero described the over-the-counter market as a "very vague market," in which "the only way to operate . . . is through networking and knowing where to step and where not to step." In Fiero's view, "in small cap penny stock markets, information is key and intelligence is key." Fiero relied heavily on information that he gathered through networking and gained much of his "intelligence" from two of his friends, Gurian n5 and John Moran ("Moran").

n5 Fiero considered Gurian to be a good source of information in the penny stock market. In deposition and NASD investigative testimony that Fiero provided years before the Hearing Panel hearing, Fiero described Gurian as a close friend. He stated that he had known Gurian for many years and talked with Gurian frequently, sometimes as often as every day. Fiero also testified during investigative testimony that he visited Gurian socially in Florida (where Gurian resided). After the complaint in this matter was filed, however, Fiero's testimony regarding Gurian changed substantially. At the Hearing Panel hearing, Fiero testified that he would characterize Gurian as a "friend" only if using the term "very loosely."

[*12]

C. Gurian And Moran

In 1995, Moran operated a consulting business. Moran transacted business with and brought underwriting clients to Hanover. Fiero met Moran through their mutual friend, Gurian. Fiero considered Moran, like Gurian, to be a good source of information regarding the penny stock market because Moran had operated an NASD member firm until early 1990. Subsequently, the Securities and Exchange Commission barred Moran from the securities industry.

During the relevant period, Gurian functioned on behalf of Falcon and Sovereign. Moran testified that he had visited Gurian in the offices of Sovereign and Falcon in 1995. Moran observed Gurian sitting at the trading desks, talking on the firms' telephones, and executing orders. Moran regularly contacted Gurian during trading hours at the offices of Falcon or Sovereign. Moran testified that Glen Vittor, Sovereign's and Falcon's president, was merely a "rubber stamp" for Gurian; that Gurian told Moran that he (Gurian) controlled Falcon; that Gurian negotiated an underwriting commitment on behalf of Sovereign; and that Gurian negotiated to sell Sovereign in late 1994. Fiero too testified that Gurian was at the offices of Falcon [*13] and Sovereign "a lot" during the relevant period and that Gurian would "sometimes" answer the trading phones when Fiero called.

Several securities accounts in the names of individuals or entities associated with Gurian were involved in the bear raid. For instance, the DiPrimo account at Brod was associated with Gurian and was involved in a significant number of short sales of Hanover securities. n6 Furthermore, accounts at Sovereign in the names of Tally and Rocena, the Bahamian limited partners in Falcon; RA, a Bahamian individual who had the same post office box address as DiPrimo; and VM and AK, two friends of Gurian, also acted as short-selling vehicles in the bear raid.

> n6 Gurian was connected to DiPrimo in many ways. Gurian was in contact and often met with OP, a Bahamian lawyer who represented DiPrimo. BG, an American attorney who represented DiPrimo, talked with Gurian regarding BG's representation of DiPrimo. Furthermore, Gurian could be contacted at an address that was the same address as that to which BG was instructed to send correspondence relating to DiPrimo.

D. The Manipulation

1. Short Selling Begins

The DiPrimo account and Falcon began short selling the [*14] Hanover securities in early January 1995, before the commencement of the Fiero Respondents' involvement in the bear raid.

On January 11, DiPrimo opened its account at Brod. Iacono, Brod's trader, previously had not handled retail customer accounts (except for accounts belonging to family members). Iacono testified that he had no idea why the DiPrimo representative had contacted him to handle the account. At the time, Iacono and Fiero were friends, and the new account form for the DiPrimo account indicated that the account had been referred. n7 On January 11, the DiPrimo account began trading. Its first trade was a short sale to NASD member firm Mitchum, Jones & Templeton, Inc. ("Mitchum Jones") of three Hanover securities worth approximately $ 250,000. n8

> n7 Iacono stated that the account form was incorrect.

> n8 Iacono charged the DiPrimo account commissions of just $ 50 per trade -- of which Iacono received only half. During the period from January 11 through February 28, 1995, Iacono executed 54 trades in Hanover securities for the DiPrimo account. The trades totaled approximately $ 11 million. Iacono charged the account commissions of just $ 2,700.

On January 17, 1995, the [*15] DiPrimo account sold short to Mitchum Jones six different Hanover securities (a

total of 24,000 shares or units). On the same day, Falcon sold short the same six Hanover securities (approximately 35,500 shares or units for an approximate sales price of $ 519,000). Several of Falcon's short sales also were to Mitchum Jones. n9

n9 In a September 11, 1996 deposition, Glen Vittor (Falcon's president and trader) could not recall any specifics about these securities and claimed that he had no memory of why he began selling Hanover securities short in January 1995.

On January 18, 1995, the DiPrimo account sold short to Mitchum Jones 7,000 shares each of two Hanover securities. On the same day, Falcon sold short the same securities plus four additional Hanover securities. In total, Falcon sold short approximately 117,000 shares or units of Hanover securities on January 18, increasing its short positions in these securities to more than $ 2 million. Falcon made the majority of these short sales to Mitchum Jones. n10

n10 During this period, Fiero made several late-night telephone calls to Robbie Hoffman ("Hoffman"), Mitchum Jones' trader with whom Fiero had a business relationship, at Hoffman's home in Colorado. On January 12, Fiero called Hoffman at home at 10:47 p.m. On January 17, Fiero called Hoffman at home at 10:11 p.m. and spoke for more than 30 minutes. On January 18, Fiero called Hoffman at home at 10:40 p.m. and spoke for 19 minutes. Between January 11 (when DiPrimo opened its account) and January 19, Fiero also had many late-night contacts with Gurian and Falcon. On January 11, Falcon called Fiero 16 times. On January 12, Gurian called Fiero six times. On January 13, Gurian called Fiero twice, Fiero called Gurian once, and Falcon called Fiero 28 times. Over the weekend of January 14 and 15, Fiero and Gurian had telephone contact four times. On January 16, Falcon called Fiero 12 times. On January 17, Falcon called Fiero 13 times. On January 18, Falcon called Fiero 10 times.

[*16]

2. The Bear Raid -- Stage One Begins

Between January 19 and 26, 1995, the first stage of the bear raid, Fiero Brothers established substantial short positions in seven Hanover securities. During the same period, other participants in the bear raid also established substantial short positions in the same Hanover securities. Because Hanover held substantial long positions in all 10 of the Hanover securities, Hanover's financial interest was to prevent a decline in the price of the Hanover securities.

In an effort to help Hanover work out an arrangement to halt the short-selling pressure on the Hanover securities, Moran contacted Fiero during the week of January 16 and asked him to become a market maker in the Hanover securities. n11 Moran believed that if Fiero, who was a well-known short seller, supported the Hanover securities, other short sellers would be discouraged or intimidated. n12

n11 According to Moran, he became interested in helping Hanover after he proposed that Hanover underwrite an IPO for one of his consulting clients, Sea Bright Foods ("Sea Bright"). Moran testified that Hanover had agreed to take Sea Bright public, but went out of business before that occurred. Moran testified that the Sea Bright IPO was supposed to follow Hanover's IPO of PANXU in January 1995. In January 1995, Hanover asked Moran for help to protect its capital position -- capital that Hanover would need for the Sea Bright IPO. Moran agreed to help in order to protect Hanover's ability to complete the Sea Bright IPO.

[*17]

n12 During NASD investigative testimony in May 1995 and September 1996, Fiero claimed that he had no

recollection as to why Fiero Brothers registered as a market maker in the Hanover securities. At the Hearing Panel hearing many years later in 1999, however, Fiero testified that Moran had requested that Fiero Brothers become a market maker and that he (Fiero) had agreed because he believed that the Hanover securities were overpriced.

Fiero attempted to register as a market maker in PANXU on January 18 (the day that the stock went public), but was unable to register. During a five-minute period on January 19, 1995, Fiero Brothers registered as a market maker in all of the Hanover securities except PANXU. Fiero Brothers became a market maker in PANXU on January 23, 1995.

In a further effort to help Hanover, sometime around January 20, Moran also placed a call to Carlson (owner of Aspen), a well-known short seller. Moran was familiar with Carlson and knew that he often held short positions. Moran did not speak to Carlson, but he left a message and received a return call from Gurian, not Carlson, almost immediately. Moran testified that, when Gurian called him, Gurian said "he had [*18] heard about [the short-selling, but] wasn't personally involved. ... He said the way to handle this was not ... for [Moran] to call Carlson [but, instead, Gurian] as a favor to [Moran] ... would call Carlson." According to Moran, this was consistent with an historical pattern in which "stock would get shorted and then there would be a mediator to come in and negotiate ... so the shorts would go away." Gurian proposed that Hanover sell blocks of the Hanover securities at discounted prices so the short sellers could fill their short positions at a substantial profit and that, in return, the short selling would cease.

Moran spoke to Hanover about Gurian's offer, but Hanover initially was not interested. During the following week, however, Moran continued to talk to Gurian and Hanover separately, and eventually Gurian and Hanover discussed the matter directly. Between January 21 and 25, as the short selling intensified, Gurian and Hanover negotiated a deal to end the short selling by Hanover's selling discounted stock to Carlson. Moran heard from both sides that "the deal was consummated." n13 During negotiations between Gurian and Hanover, Gurian, Falcon, Carlson, and Fiero remained [*19] in constant contact with each other. On Saturday, January 21, 1995, Gurian called Fiero at home, and Carlson called Gurian twice. On Sunday, January 22, Gurian and Fiero exchanged six phone calls before midnight and two phone calls after midnight. On Monday, January 23, Falcon and Fiero exchanged 39 phone calls, Carlson and Falcon exchanged 12 phone calls, and Carlson and Fiero exchanged six phone calls. n14 In the evening on January 23, Fiero exchanged six calls with Gurian and called Hoffman at his home three times. On January 24, Falcon and Fiero exchanged 31 telephone calls. Carlson had nine calls with Falcon, nine with Fiero, and four with Gurian. On January 25, Falcon and Fiero called each other 29 times. Carlson called Falcon 12 times, Fiero five times, and Gurian once.

n13 Moran testified that the deal would involve Hanover's selling blocks of the Hanover securities at discounted prices to Carlson, who would break up the blocks and allocate shares to the group of short sellers.

n14 Fiero purportedly did not like Carlson, but had many telephone communications with him in January 1995. The two had telephone contact many times in January, including on January 26, the day that Fiero purchased a large block of Hanover securities from Hanover, when Carlson called Fiero 15 times. Fiero also admitted that he had visited Carlson's mountain cabin in Colorado.

[*20]

On Friday, January 20, 1995, at approximately 12:36 p.m. (eastern time), cable television channel CNBC broadcasted a negative report by Dan Dorfman ("Dorfman"), discussing the Hanover securities. In the report, Dorfman talked about PANXU, noting that it had gone public on January 18 at $ 5 per unit and immediately shot up to $ 23 per unit. Dorfman noted that the company's business was to develop pharmaceutical products from plants with a history of medicinal use. Dorfman ridiculed the stock, stating:

It's losing, get this now, it's losing money, has no revenues, its research team was just put together. The prospectus shows it needs substantial additional financing to develop commercially feasible products; that's above the recent money raised in the offering. . . . The company also says, get this now, there is

substantial doubt about its ability to continue as a going concern. The underwriter is [Hanover], a brokerage firm that's under an SEC investigation. Now [Carlson], a money manager who shorted the stock, alleges that he was at one time threatened by an official of the brokerage firm. That official, by the way, through an attorney, denies it. Carlson in any case rates this [*21] stock a joke, as well as two other [Hanover] offerings - [MRJY] and [EVRM]. Panax, by the way, declined comment. n15

n15 Telephone records reflect a significant number of calls between Carlson, the individual who talked to Dorfman about Hanover securities, Fiero, Falcon, and Gurian before, during, and immediately after the Dorfman telecast. Just after midnight on January 19 (early in the morning of January 20, the day of the Dorman telecast), Falcon called Carlson's home. At 9:16 a.m. (in Idaho, where Carlson resided -- 11:16 a.m. eastern time) on January 20, Carlson called Falcon. At 9:24 a.m. (11:24 eastern time), Carlson called Dorfman and immediately thereafter (11:27 eastern time) called Falcon. At 11:35 (eastern time), Carlson called Fiero. Carlson called Dorfman again at 9:39 a.m. and 9:40 a.m. (11:39 and 11:40 eastern time) and called Falcon six times between 9:47 a.m. (11:47 eastern time) and 10:09 a.m. (12:09 eastern time). Carlson called Dorfman at 10:11 a.m. (12:11 eastern time), Falcon at 10:19 a.m. (12:19 eastern time), and Fiero at 10:23 a.m. (12:23 eastern time -- just 13 minutes before the Dorfman report aired at 12:36 eastern time). At 10:30 a.m. (12:30 eastern time) Carlson called Dorfman, and at 10:31 a.m. (12:31 eastern time), he called Falcon again. On January 20, Falcon called Fiero 10 times between 9:29 a.m. and 12:29 p.m. Carlson, Falcon, and Fiero maintained frequent telephone contact for the remainder of the day after the Dorfman telecast on January 20. In total, on January 20, Carlson and Falcon exchanged 31 telephone calls, Falcon and Fiero exchanged 29 telephone calls, and Carlson called Fiero eight times.

[*22]

After Dorfman's January 20 report, short-selling pressure on the Hanover securities increased dramatically (specifically, Fiero Brothers, Falcon, and the DiPrimo account established large short positions) and the prices of several of the securities, including PANXU, dropped precipitously. On January 19, when Fiero Brothers first registered as a market maker in the Hanover securities, the Firm had a short position in only one Hanover security of 7,000 shares, warrants, or units valued at approximately $ 80,000. Six days later, on January 25, Fiero Brothers had built an aggregate short position in seven Hanover securities of approximately 105,000 shares, warrants, or units with a value of approximately $ 1.2 million.

As of January 16, several days before the Dorfman broadcast, Falcon had established a short position of 11,475 shares, warrants, or units, valued at approximately $ 218,000, in one Hanover security. By January 25, Falcon had established short positions in the same seven Hanover securities that Fiero Brothers had sold short, totaling approximately 232,000 shares, warrants, or units, with a value of approximately $ 2.9 million.

As of January 16, the DiPrimo account held short [*23] positions in three Hanover securities totaling 15,000 shares, warrants, or units worth approximately $ 251,000. By January 25, the DiPrimo account held short positions in the same seven Hanover securities that Fiero Brothers and Falcon had sold short, totaling 143,000 shares, warrants, or units with a value of approximately $ 1.8 million. n16

n16 Other participants in the bear raid established smaller short positions in the Hanover securities during the same period. Tally had established a short position of 25,000 warrants in ATOYZ, Rocena had established a short position of 30,000 shares in MRJY, and VM (Gurian's friend) had established short positions in three Hanover securities valued at $ 844,686.

3. The Fiero Respondents Purchase A Block Of Hanover Securities At A Discount

Fiero contended that he learned through his "networking" that Hanover planned to sell a block of the Hanover

securities at a discounted price. Fiero stated that his "intelligence" told him that Carlson intended to broker the block purchase. Fiero contacted Moran in the evening on January 25, 1995. Fiero proposed to Moran that he (Fiero) broker the block purchase instead of Carlson. Moran agreed. n17 [*24]  Fiero also identified an individual, "BJ," to Moran as the person who, acting through Mitchum Jones, was the largest short seller in Hanover securities. n18 Fiero said he had talked to BJ, who represented "blue chip guys," and that Mitchum Jones (a market maker in Hanover securities) would "go off the box after they were filled." n19 Moran understood from this that, once the deal was completed, the short selling would stop and those market makers in the Hanover securities who were involved in short selling would withdraw as market makers. n20

n17 Moran testified that Fiero wanted to "beat Carlson out of it, leave [Carlson] short, hanging him out and everybody else will be gone."

n18 In January 1995, Falcon and the DiPrimo account sold Hanover securities short to Mitchum Jones. At the same time, Fiero engaged in lengthy, late-night conversations with Hoffman, a trader at Mitchum Jones who previously had worked for Carlson.

n19 "Off the box" is a term of art that suggests that the firm at issue will cease its market maker registration.

n20 Robert Catoggio ("Catoggio"), Hanover's trader, testified similarly to Moran. The record included portions of a May 1995 NASD investigative interview of Catoggio. He was not available to testify in person at the Hearing Panel hearing because he was serving a sentence in federal prison. Catoggio testified that in January 1995, Hanover's capital position had been seriously threatened as a result of short-selling pressure on the Hanover securities. He testified that Moran brought the Sea Bright deal to Hanover, and that Hanover planned to make Sea Bright its next IPO, but the pressure on Hanover's capital from short selling threatened this plan. Catoggio testified that Moran believed that Gurian was involved in the short selling and referred Gurian to Catoggio. Catoggio testified that Gurian called him, told Catoggio he knew who was shorting the Hanover securities, and offered to "play the middle and work out a deal where [the short sellers] would stop shorting" the Hanover securities.

Catoggio testified that Gurian wanted approximately $ 13 million worth of Hanover securities at below-market prices. Catoggio testified that he and Gurian did not negotiate precise amounts of the Hanover securities that Hanover would sell because Catoggio understood the amounts would be whatever the short sellers needed to cover their positions. He also testified that they did negotiate specific below-market prices for the Hanover securities and discussed how the trades would be executed. According to Catoggio, Gurian proposed that the trades be executed through Fiero, and there was no discussion between Catoggio and Gurian about effecting the trades through some other broker-dealer such as Carlson.

Catoggio testified that Hanover agreed to Gurian's demands in order to halt the short selling. Catoggio understood that, if Hanover agreed, the short selling would stop and the firms involved in the short selling that were registered as market makers in the Hanover securities (which Catoggio understood included Mitchum Jones and Fiero Brothers) would withdraw as market makers.

[*25]

Fiero denied having knowledge of Gurian's deal with Hanover. He testified that on the morning of January 26, he began making calls to and receiving calls from people who might be interested in buying the Hanover securities that he planned to purchase from Hanover. Before making the trades with Hanover that afternoon, he identified as prospective purchasers Falcon, which was not registered as a market maker, the DiPrimo account at Brod, which was not registered as a market maker, Midland Walwyn ("Midland Walwyn"), a Canadian firm that was not a market maker in the Hanover securities, but at which Gurian's friend AK had an account that was short 22,500 Hanover securities, as well as other accounts with substantial short positions in the Hanover securities. n21 Fiero testified that he obtained expressions

of interest from these potential purchasers and "a general feeling" about how much of the Hanover securities he should buy, but that he had no firm commitments from them to purchase specific amounts of the Hanover securities at specific prices.

n21 At the Hearing Panel hearing, Fiero testified that Moran identified firms that were short Hanover securities. During an NASD investigative interview in May 1995, however, Fiero testified that he located short sellers by contacting market makers in the Hanover securities and other firms that he described as "just people that I know."

[*26]

In accordance with the terms negotiated between Gurian and Hanover, on January 26 and 27, 1995, Fiero Brothers purchased from Hanover 974,000 shares, units or warrants in eight Hanover securities at a total price of almost $ 12.1 million, n22 a discount of $ 866,500 below the inside bid. These were the same securities in which Fiero Brothers, Falcon, and the DiPrimo account held substantial short positions. The amount of the discount that Hanover gave Fiero corresponded precisely with the amount that Catoggio testified that Hanover had negotiated with Gurian. Fiero denied that he had any knowledge of the terms negotiated between Gurian and Hanover. He contended that he "just picked the prices" that he would pay for the Hanover securities and that Hanover went along with the discounted prices that Fiero picked.

n22 At the time that Fiero committed $ 12.1 million to purchase the Hanover securities, for which he purportedly had no firm commitments for subsequent sales, Fiero Brothers' capital was between $ 8 million and $ 9 million.

Fiero Brothers used some of the stock to cover its own short positions and sold the rest to other participants in the bear raid, primarily Falcon and [*27] the DiPrimo account, to cover their short positions. Fiero Brothers sold 372,200 shares, warrants, or units in eight Hanover securities to Falcon for $ 4,849,059, which was a discount of $ 137,991 from the inside bid. Fiero Brothers sold 245,000 shares, warrants, or units in seven Hanover securities to the DiPrimo account for $ 3,263,811, which was a discount of $ 106,689 from the inside bid. Fiero Brothers also distributed 24,300 shares, warrants, or units in Hanover securities to Mitchum Jones, 25,000 shares, warrants, or units to Sovereign (which covered Falcon limited partner Tally's short position), and 54,000 shares, warrants, or units to Midland Walwyn (22,500 of which went to Gurian's friend AK, who maintained an account at Midland).

At the end of the day on January 27, 1995, Fiero Brothers' position in the Hanover securities was almost flat, n23 after having had a short position of 162,440 securities one day earlier. Falcon's position in the Hanover securities was flat, after having had a short position the day before of 272,250 shares, warrants, or units in eight Hanover securities. The DiPrimo account's position in Hanover securities was nearly flat, n24 after having held [*28] a short position of 183,500 shares, warrants, or units in seven Hanover securities the day before. Tally also had covered its 25,000-warrant short position in ATOYZ with warrants that Fiero Brothers sold to Sovereign, and its position was flat on January 27. Rocena also covered its 30,000-share short position in MRJY with shares that Fiero Brothers sold to Falcon, and it too was flat on January 27.

n23 At the end of the day on January 27, Fiero Brothers was short 3,700 PLCOU and long 1,000 PANXU and 75 ATOYZ.

n24 The DiPrimo account was long 3,500 shares of PMNR at the end of the day on January 27.

The Fiero Respondents made a profit of approximately $ 567,981 from covering their own short positions in the Hanover securities and selling the excess of their block purchase to other short sellers. Falcon made a profit of approximately $ 694,028 from covering its short positions in the Hanover securities with securities purchased from

Fiero Brothers. The DiPrimo account made approximately $ 491,457 in profit from covering its short positions in the Hanover securities with securities purchased from Fiero Brothers.

4. The Short Sellers Withdraw As Market Makers

The Fiero Respondents [*29] completed the block purchases and the resales of ATOY, EVRM, MRJY, PANXU, PLCOU and PMNR on January 26, and Fiero Brothers withdrew as a market maker in those Hanover securities the following morning. The Fiero Respondents completed the purchases and resales of APROU on the morning of January 27, and Fiero Brothers withdrew as a market maker in that Hanover security immediately thereafter. Mitchum Jones also withdrew as a market maker in the Hanover securities on January 26 and 27.

5. The Bear Raid -- Stage Two Begins

Almost immediately after the Fiero Respondents executed the block purchase of Hanover securities from Hanover and subsequent sales of the Hanover securities to the short sellers, the Fiero Respondents and other participants in the bear raid began short selling the Hanover securities again. Between January 27 and February 24, 1995, the day when Hanover went out of business, Fiero Brothers and others established large short positions in the Hanover securities.

Fiero Brothers resumed short selling on January 30, the first trading day after it had executed the block purchase from Hanover. n25 By February 23, the day before Hanover closed its doors, Fiero had amassed [*30] a short position of 272,500 shares, warrants, or units in eight Hanover securities, valued at approximately $ 3.23 million. Fiero professed that he could not recall why he had increased his short positions in Hanover securities so dramatically during this period. n26

> n25 Fiero Brothers steadily increased its short position in Hanover securities from a position valued at $ 54,356 on January 27 to a position valued at $ 119,756 as of January 30, $ 486,400 as of February 3, $ 1,027,041 as of February 8, $ 2,002,103 as of February 15, and $ 3,233,945 as of February 23.

> n26 Fiero testified that on or about February 13, 1995, Roy Ageloff ("Ageloff"), an executive at Hanover, and another individual visited Fiero at his office for the purposes of threatening and intimidating him and attempting to stop the short selling of the Hanover securities. Fiero also testified that he received threatening phone calls during this period and a box of dead fish. Fiero nonetheless continued selling Hanover securities short. Moran testified that, around this time, Gurian told Moran that Fiero had been threatened and that, in response, Gurian was "declaring" himself by shorting Hanover securities.

[*31]

On February 2, Falcon began selling short again. As of February 23, 1995, Falcon had established a short position of 733,007 shares, warrants, or units in nine Hanover securities valued at $ 7,634,643. On February 24, Falcon had increased its short position by more than 439,000 additional securities.

The DiPrimo account also began selling Hanover securities short again on the first trading day after Fiero Brothers' block purchase from Hanover. By February 23, the DiPrimo account's short position had grown to 96,325 Hanover securities, valued at $ 1,603,481. On February 24, the DiPrimo account sold an additional 75,000 Hanover securities (valued at approximately $ 1 million) short.

Aspen (Carlson's firm) increased its short position as of February 23 to 76,900 shares, warrants, or units in six Hanover securities, valued at over $ 1.2 million. Sovereign, which had not held any position in the Hanover securities until February 16, had a short position of $ 226,438 in Hanover securities as of February 23. n27

> n27 Other related entities also continued their short selling of Hanover securities. Falcon limited partner

Case 1:08-cv-01298-VM     Document 8-4     Filed 08/04/2008     Page 14 of 38

Page 12
2002 NASD Discip. LEXIS 16, *31

Rocena sold 45,000 PANXU short for $ 770,625 through Sovereign on February 13. Rocena also sold another 55,000 PANXU short on February 24. Tally, another Bahamian limited partner of Falcon, sold 75,000 PANXU short on February 24. Gurian's friend, VM, also sold short 48,000 PANXU (for $ 820,000) on February 17 and 21.

[*32]

On Friday, February 24, 1995, Hanover went out of business. On the following Monday, February 27, Adler Coleman, Hanover's clearing firm, also closed its doors. Both subsequently filed for bankruptcy protection. On February 24 and 27, Fiero Brothers registered again as a market maker in the Hanover securities. After Fiero Brothers re-emerged as a market maker in the Hanover securities, the Fiero Respondents continued their short sales of the Hanover securities.

The prices of the Hanover securities dropped after Hanover failed, and the securities have retained little or no value since then. The Securities Investor Protection Corporation ("SIPC") appointed a trustee for Adler Coleman, and the trustee bought in many of the short positions, including Fiero Brothers' positions. The buy-ins have resulted in a series of lawsuits.

II. DISCUSSION

We find that the Fiero Respondents, in collusion with others, participated in a bear raid and coercive activity that resulted in a manipulation of the market for Hanover securities and violated NASD's affirmative determination requirements.

As more fully discussed below, we also have considered and rejected the Fiero Respondents' procedural [*33] arguments. We find that the Hearing Panel afforded the Fiero Respondents procedural fairness in its consideration of this matter.

A. Market Manipulation

We find that in January and February 1995, the Fiero Respondents, in conjunction with others, manipulated the market for the Hanover securities by engaging in a manipulative short-selling scheme, short selling securities that they knew could not be borrowed for delivery, acting collusively with others to drive down the prices of Hanover securities, and coercing Hanover to sell the Hanover securities to Fiero at below-market prices, in violation of Section 10(b) of the Exchange Act, Rule 10b-5, and Conduct Rules 2110 and 2120.

Section 10(b) provides that it is unlawful for any person, directly or indirectly, "to use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." SEC Rule 10b-5 implements Section 10(b) and states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility [*34] of any national securities exchange:

(1) To employ any device, scheme, or artifice to defraud,

. . . . [or]

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

In connection with the purchase or sale of any security.

Rule 2120, NASD's anti-fraud rule, parallels SEC Rule 10b-5 and states that no member shall effect any transaction in,

or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance.

Rule 2110 provides a broad ethical standard for the conduct of members. Under Rule 2110, members and their associated persons n28 must observe high standards of commercial honor and just and equitable principles of trade.

> n28 Rule 2110 proscribes members from acting unethically. NASD Rule 115(a) states that all rules applicable to members apply with equal force to associated persons.

1. The Fiero Respondents Injected Inaccurate Information Into The Marketplace And Interfered With The Free Forces Of Supply And Demand

The evidence shows that the Fiero Respondents, along with others, engaged in manipulation and deception relating to [*35] the Hanover securities. The evidence demonstrates that, in connection with Fiero Brothers' purchases and sales of the Hanover securities and for the purpose of reducing the prices of those securities, the Fiero Respondents acted in concert with others to execute short sales without knowing that they could borrow or deliver the securities. The Fiero Respondents' repeated execution of short sales when they had not located the stock for borrowing created the false impression in the marketplace that the true holders of the Hanover securities were selling the stock. As a result, the Fiero Respondents intentionally injected inaccurate information into the market for Hanover securities, because it was the concerted efforts of the short-selling group, not true market forces of supply and demand, that created the massive sales effort. Based on this deception, the Fiero Respondents manipulated downward the market price of the Hanover securities. In addition, rather than borrowing or delivering securities through legitimate means, the Fiero Respondents and the short-selling group covered their initial short sales through coerced purchases and discounted resales as part of their manipulation. [*36]

The Fiero Respondents' participation in a manipulation and use of deception violated the SEC's anti-fraud provisions. "Manipulation is the deceptive movement of a security's price, accomplished by an intentional interference with the forces of supply and demand." Patten Securities Corp., 51 S.E.C. 568, 572 (1993). A manipulation occurs when inaccurate information is disseminated into the marketplace. In re Olympia Brewing Company, 613 F. Supp. 1286, 1290-1291 (N. D. Ill. 1985).

It is well settled that the anti-fraud provisions of the Exchange Act are designed to prevent not only the defrauding of investors, but apply "with equal force [to] the impediments to a free and open market created by artificial stimulants or restraints." Cohen Goren Equities, Inc., SEC Admin. Proc. File No. 3-4330, 1975 SEC LEXIS 2545 (Initial Decision) (Feb. 28, 1975), citing Masland, Fernon & Anderson, 9 S.E.C. 338, 344 (1941). Thus, the anti-fraud rules proscribe fraud on market professionals as well as the defrauding of individual customers. The manipulation of a market results from activities, like those involved in this case, that "[create] the false impression that certain market activity [*37] is occurring when in fact such activity is unrelated to the actual supply and demand." Hundahl v. United Benefit Life Insurance Co., 465 F. Supp. 1349, 1360 (N.D. Tex. 1979).

Here, the Fiero Respondents participated in a manipulative short-selling scheme, colluded to drive down the prices of Hanover securities, and coerced Hanover [to] selling Hanover securities to them at below-market prices. The Fiero Respondents disseminated inaccurate information regarding the Hanover securities into the marketplace and misled the market as to the true price for and level of interest in the Hanover securities for the purpose of driving down the prices of the Hanover securities. n29 See GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189 (3d Cir. 2001) (the injection of inaccurate information into the marketplace or the creation of a false impression of supply and demand for a security for the purpose of artificially depressing or inflating the price of the security is deceptive and manipulative conduct). n30

> n29 The Fiero Respondents' misconduct -- short selling securities that were not borrowable or deliverable, participating in a bear raid, and engaging in coercive activity -- all occurred in connection with purchases and

sales of the Hanover securities, thus establishing a required element of proof for a Section 10(b) and Rule 10b-5 violation. Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).

[*38]

n30 The Fiero Respondents contend that Hanover was, itself, engaged in a fraudulent scheme to manipulate the price of Hanover securities upward and that their conduct was designed to bring the prices of the Hanover securities back to where they should be. The Fiero Respondents cite no legal support for their position that Hanover's purported manipulation of the Hanover securities should serve as a defense to them. Furthermore, even if true, Hanover's actions do not excuse the Fiero Respondents' misconduct. A fraudulent scheme is manipulative even if "the goal is to get the stock to a price more reflective of its 'true worth.'" U.S. v. Hall, 48 F. Supp. 2d 386, 387 (S.D. N.Y. 1999). Here, the Fiero Respondents acted in concert with others to supersede the free forces of supply and demand and create the impression of massive selling in the Hanover securities markets when, in fact, the securities were not borrowable and the sellers could not deliver.

Our finding of market manipulation in this case is not based on our conclusion that the Fiero Respondents sold short because they believed that the market for Hanover securities was artificially overpriced. Rather, we find manipulation because the Fiero Respondents knew that neither they nor the other short sellers could borrow the Hanover securities for delivery, but they nonetheless sold the Hanover securities short for the purpose of artificially deflating the prices of those securities. The Fiero Respondents' short sales were not specifically intended to correct a market artificially inflated by Hanover's manipulation. They were part of a concerted effort to manipulate the market downward through a short-selling scheme. In any event, a manipulation by Hanover does not excuse the Fiero Respondents' misconduct.

[*39]

a. *The Fiero Respondents Manipulated The Hanover Securities Market During The First Stage Of The Bear Raid (January 19 through 26, 1995)*

The Fiero Respondents do not dispute that on January 25 and 26, 1995, Fiero Brothers executed a block purchase of Hanover securities from Hanover at deeply discounted prices. The Fiero Respondents contend that, at the time, Fiero was unaware of the short-selling pressure on Hanover and of the negotiations between Gurian and Hanover to end the short selling. We find that the evidence belies Fiero's contention and in fact demonstrates that the Fiero Respondents were intimately involved in every stage of the misconduct, which included a manipulative short-selling campaign designed to drive down the prices of the Hanover securities and exert pressure on Hanover.

Even before the bear raid began, the Fiero Respondents were aware of the activities of the other participants in the bear raid. Starting on January 11, the DiPrimo account and Falcon began exerting pressure on Hanover with short sales of the Hanover securities. The DiPrimo account sold short primarily to Mitchum Jones. Although the Fiero Respondents did not commence Fiero Brothers' short-selling [*40] campaign at that time, Fiero was in constant contact with his friend Hoffman, the trader at Mitchum Jones, Falcon, and Gurian. Soon thereafter, Fiero Brothers registered as a market maker in the Hanover securities, and the Fiero Respondents commenced their own wave of short selling. Between January 19 and 26, 1995, the first stage of the bear raid, Fiero Brothers, Falcon, and the DiPrimo account established sizeable short positions in the Hanover securities. n31

n31 By January 25, 1995, Fiero Brothers had amassed a short position in the Hanover securities of 105,000 shares, warrants, or units valued at approximately $ 1.2 million. By January 25, Falcon and the DiPrimo account both had established large short positions in the same Hanover securities that Fiero Brothers had sold short. Falcon held a short position valued at approximately $ 2.9 million, and the DiPrimo account held a short position valued at approximately $ 1.8 million. At the same time, other friends and associates of Gurian also had

established short positions in many of the Hanover securities.

Fiero's testimony about his supposedly serendipitous short selling and discounted purchasing of Hanover securities supports [*41] our finding that the Fiero Respondents were involved in a market manipulation. At the Hearing Panel hearing, Fiero testified that he was not aware of or acting in concert with the other short sellers. He claimed that he became a market maker in the Hanover securities after receiving a call from Moran and that he began selling Hanover securities short because he believed that the Hanover securities were overpriced. Fiero's contentions are contradicted by significant evidence, including his own prior testimony.

At NASD investigative interviews held soon after the events at issue, Fiero could offer no explanation as to why he became a market maker in the Hanover securities or why he began selling the securities short. Indeed, at interviews in May 1995 and later in 1996, Fiero maintained that he was able to recall little about any one of the Hanover securities, although before the Hearing Panel he claimed to have maintained due diligence files on each of the securities. Furthermore, Fiero claimed in post-hearing submissions that he favored long positions in Hanover securities and, between January 19 and 26, Fiero Brothers held or shared the high bid in many Hanover securities. Yet, Fiero [*42] testified before the Hearing Panel that when Fiero Brothers first started making markets in the Hanover securities, he believed they were overpriced. Fiero's two purported views are inconsistent, since it would be contradictory for Fiero to favor long positions or for Fiero Brothers to hold the high bid in a security that Fiero believed to be overpriced. n32

> n32 Other contradictions plague the Fiero Respondents' assertions. The Fiero Respondents contended below that, at times, Fiero Brothers held intra-day long positions in the Hanover securities. The few intra-day long positions that Fiero Brothers did hold, however, were held for very short periods of time. For example, Fiero Brothers held a 17,000-unit long position in PANXU on January 18 for one minute before selling the units to Mitchum Jones. Fiero Brothers also held a 7,500-unit long position in PANXU on January 19 for one minute before again selling the units to Mitchum Jones. Fiero Brothers never held a long position in any of the Hanover securities at the end of the day, and it, in fact, steadily increased its end-of-day short positions in Hanover securities throughout the period from January 19 through 26, 1995.

Also [*43] telling of the Fiero Respondents' knowledge of and involvement in the pattern of short selling are the communications that occurred between Falcon, Fiero, and Gurian during the first stage of the bear raid. For example, Falcon and Fiero exchanged 25 telephone calls on January 20. Gurian and Fiero exchanged seven telephone calls over the weekend of January 21 through 22. Falcon and Fiero exchanged 39 telephone calls on Monday, January 23, 31 telephone calls on Tuesday, January 24, and 25 telephone calls on January 25. Gurian and Fiero also exchanged six telephone calls during the evening of January 23. n33 Given the volume and pattern of telephone calls between the Fiero Respondents and other short sellers during the first stage of the bear raid, we conclude that Fiero's testimony that he was wholly unaware of the other short sellers' trading activity is false.

> n33 Indeed, as intense short selling occurred on the days immediately prior to January 26, Gurian, Falcon, Fiero, and Carlson communicated often. On Saturday, January 21, 1995, Gurian called Fiero at home, and Carlson called Gurian twice. On Sunday, January 22, Gurian and Fiero exchanged six phone calls before midnight and two phone calls after midnight. On Monday, January 23, Falcon and Fiero exchanged 39 phone calls, Carlson and Falcon exchanged 12 phone calls, and Carlson and Fiero exchanged six phone calls. In the evening on January 23, Fiero exchanged six calls with Gurian, and called Hoffman at his home three times. On January 24, Falcon and Fiero exchanged 31 telephone calls. Carlson had nine calls with Falcon, nine with Fiero, and four with Gurian. On January 25, Falcon and Fiero called each other 29 times. Carlson called Falcon 12 times, Fiero five times, and Gurian once.

[*44]

We also find indicative of the Fiero Respondents' involvement in a manipulation of the Hanover securities the Fiero

2002 NASD Discip. LEXIS 16, *44

Respondents' January 26 and 27, 1995 block purchase of 974,000 Hanover securities from Hanover. Fiero claims to have had no knowledge of the deal that Gurian negotiated with Hanover. Significant evidence proves the contrary.

Numerous telephone calls from Fiero to Gurian and Glen Vittor and a late-night call to Moran contradict Fiero's claim of ignorance. On the evening of January 25, the night that Gurian and Hanover reached an agreement to stop the short selling, Fiero called Glen Vittor (president of Sovereign and Falcon and a close associate of Gurian) at home at 9:13 p.m. and called Gurian at 9:15 p.m. Falcon called Fiero at 9:23 p.m.; Fiero called Gurian at 9:25 p.m.; Fiero called Glen Vittor at 9:44 p.m.; and Fiero called Gurian at 9:51 p.m. After all of these calls, Fiero called Moran at 11:10 p.m., and, according to Fiero, attempted to persuade Moran and Hanover to execute the block sale of Hanover securities through Fiero Brothers rather than through Carlson (Aspen), a man with whom Fiero also communicated on January 25 and 26. We find incredible Fiero's argument [*45] that he did not know (before he spoke with Moran at 11:10 p.m.) of Hanover's agreement to sell a block of Hanover securities at a deep discount, in light of the numerous calls between Fiero, Glen Vittor, Gurian, and Falcon on the very day that Gurian and Hanover had reached their agreement and the fact that Fiero knew to contact Moran regarding the impending block sale.

Our finding that the Fiero Respondents manipulated the Hanover securities market is further supported by Fiero Brothers' ability to execute a block purchase from Hanover without negotiating prices or amounts and its ability easily and quickly to find fellow short sellers and subsequent purchasers of the Hanover securities block. Fiero contended that, the day after talking with Moran (January 26), he began calling around for indications of interest and that he was able to find Falcon, the DiPrimo account, Falcon limited partner Tally, Mitchum Jones, and Gurian's friend AK to purchase portions of the block of Hanover securities. n34 Fiero would have us believe that he decided to contact these potential purchasers, without knowing about their short positions, even though none of them (except Mitchum Jones) was registered [*46] as a market maker in the Hanover securities. We do not find Fiero's claims credible, and we reject them. In addition, Fiero's claim to have had no knowledge about the short sellers or the negotiated deal is further contradicted by the fact that, when Fiero contacted Hanover to broker the block purchase, he sought to purchase the exact amounts at the exact prices that Gurian had negotiated with Hanover. n35 Hanover and Fiero did not even discuss prices or amounts. Fiero Brothers' block purchase of Hanover securities from Hanover occurred at a discount of approximately $ 866,500 below the inside bid. Fiero's testimony that he "just picked the prices" that he would pay and that Hanover simply agreed to Fiero's proposed prices and to a discount of this magnitude is not credible.

n34 Falcon purchased 372,000 securities for $ 4.85 million; the Roddy DiPrimo account (that Fiero's friend Iacono traded) purchased 245,000 securities for $ 3.26 million; Falcon limited partner Tally purchased 25,000 securities for $ 125,780; Mitchum Jones purchased 24,300 securities for $ 293,150; and Gurian's friend AK purchased 32,500 securities for $ 532,500. After Fiero Brothers covered its own $ 2 million short positions and sold the remainder of the block purchase, Fiero Brothers, Falcon, and the DiPrimo account were essentially flat. [*47]

n35 Moran testified that, when Fiero contacted him on January 25 to discuss the block purchase of Hanover securities from Hanover, Fiero knew all of the details of the planned purchase. The Hearing Panel credited Moran's testimony in this regard, and we affirm the Hearing Panel's determination. The SEC consistently has held that the credibility determinations of the initial fact-finder are entitled to considerable weight and deference particularly where, as here, the Hearing Panel has had the opportunity to observe the individual's demeanor. See Jon R. Butzen, 52 S.E.C. 512, 514 (1995); Jonathan Garrett Ornstein, 51 S.E.C. 135, 137 (1992). Moreover, Moran's testimony is consistent with Catoggio's testimony (which the Hearing Panel also credited on this point) and the telephone records.

The Fiero Respondents' willingness to commit more than the Firm's capital to the block purchase is another persuasive factor that supports our finding that the Fiero Respondents were aware of and involved in the manipulative

scheme. The Fiero Respondents committed $ 12.1 million dollars to purchasing Hanover securities, supposedly without knowing who would be willing to purchase the remainder [*48] of the block from Fiero Brothers. At the time that Fiero Brothers committed $ 12.1 million to the purchase, the Firm was worth between $ 8 million and $ 9 million, and Fiero Brothers' short position was only $ 2 million. We cannot believe that Fiero would have been willing to commit more than the Firm's capital to such a purchase if he was not participating in the manipulation.

Fiero's involvement also is supported by the fact that, immediately after consummating the block purchase from Hanover, Fiero Brothers and Mitchum Jones withdrew as market makers, as Gurian and Hanover had agreed would occur. n36 Fiero testified that he withdrew Fiero Brothers from market making in the Hanover securities because he was afraid and felt that his life could be in danger if Fiero Brothers continued as a market maker. n37 When Fiero Brothers withdrew from making markets in the Hanover securities at approximately 8:00 a.m. on January 27, however, he withdrew only from the six securities that Fiero Brothers already had purchased from Hanover at a deep discount the day before. He continued as a market maker in APROU. In fact, nearly two hours after Fiero Brothers withdrew as a market maker in six Hanover [*49] securities, although Fiero purportedly feared Ageloff, Fiero Brothers purchased 90,000 APROU from Hanover at a price well below the inside bid. Fiero Brothers then sold approximately 60,000 APROU to Falcon, the DiPrimo account, and Mitchum Jones at a sizeable profit. Only then did Fiero Brothers withdraw from market making in APROU. Notwithstanding Fiero's alleged "fear," he also purchased 34,000 ATOYZ from Hanover at approximately 10:00 a.m. on January 27 and later sold the warrants to Falcon to cover Tally's short position. If indeed Fiero Brothers withdrew from market making because Fiero feared Ageloff, it stands to reason that the Firm would have withdrawn from making markets in all of the Hanover securities, not just six, and that Fiero Brothers would not have executed yet another purchase from Hanover at a significant discount and resold it at a sizeable profit. We conclude that the only explanation for this conduct is that the Fiero Respondents were involved in a market manipulation.

n36 Moran testified that Fiero told him during their telephone conversation on the evening of January 25 that once Fiero consummated the block purchase, the short selling would cease and Fiero Brothers and Mitchum Jones would withdraw their market maker registrations. After Fiero's January 25 telephone conversation with Moran, Fiero called Hoffman, Mitchum Jones' trader. The Hearing Panel noted that, like Catoggio, Moran was not entirely credible, given his past misconduct. The Hearing Panel, however, did credit portions of Moran's testimony. "The credibility determinations of an initial fact-finder are entitled to considerable weight and deference, since they are based on hearing the witnesses' testimony and observing their demeanor." Ashvin R. Shah, 52 S.E.C. 1100, 1103, n. 12 (1996). Only where the record contains "substantial evidence" to the contrary, which this record does not, should we reject such determinations. Helene R. Schwartz, 51 S.E.C. 1207, 1208, n.5 (1994).

[*50]

n37 Fiero testified that on the morning of January 26, he had a conversation with Ageloff, an executive at Hanover, in which Ageloff became verbally abusive. Fiero stated that, after his interchange with Ageloff, he had decided not to execute the block purchase out of fear, but that Moran later convinced him to do it. Fiero testified that, after the January 26 block purchase, Moran told him that Ageloff was angry that the Fiero Respondents had profited so well on the deal. Fiero stated that he knew Ageloff to be volatile, and on January 27, Fiero began receiving anonymous, threatening calls. Fiero stated that, as a result, he decided to withdraw as a market maker on January 27.

Fiero's inconsistent statements regarding the Dorfman broadcast also suggest that his descriptions of the Fiero Respondents' conduct are false. During the first stage of the bear raid, the Dorfman broadcast dramatically affected the market for the Hanover securities. During investigative testimony in May 1995, just four months after the events at issue, Fiero asserted that he could not recall any specifics about the Dorfman broadcast. At the Hearing Panel hearing,

however, his recollection regarding this [*51] issue, like many other issues, had improved dramatically. He recalled more specifics about the broadcast and remembered that it had resulted in "chaos" for the market for Hanover securities. Fiero also states that he had no advance knowledge of the broadcast (other than rumors that he may have heard). Fiero's credibility is again undermined by our evaluation of the telephone records. Immediately before, during, and after the Dorfman broadcast, Fiero was in constant contact with other short sellers, such as Gurian, Falcon, and Carlson, n38 the person responsible for providing Dorfman with negative information regarding the Hanover securities. n39 The timing and frequency of these calls cast doubt on Fiero's credibility.

   n38 Just after midnight on January 19 (early in the morning of January 20, the day of the Dorman telecast), Falcon called Carlson's home. At 9:16 a.m. (in Idaho, where Carlson resided -- 11:16 a.m. eastern time) on January 20, Carlson called Falcon. At 9:24 a.m. (11:24 eastern time), Carlson called Dorfman and immediately thereafter (11:27 eastern time) called Falcon. At 11:35 (eastern time), Carlson called Fiero. Carlson called Dorfman again at 9:39 a.m. and 9:40 a.m. (11:39 and 11:40 eastern time) and called Falcon six times between 9:47 a.m. (11:47 eastern time) and 10:09 a.m. (12:09 eastern time). Carlson called Dorfman at 10:11 a.m. (12:11 eastern time), Falcon at 10:19 a.m. (12:19 eastern time), and Fiero at 10:23 a.m. (12:23 eastern time -- just 13 minutes before the Dorfman report aired at 12:36 p.m. eastern time). At 10:30 a.m. (12:30 eastern time) Carlson called Dorfman, and at 10:31 a.m. (12:31 eastern time), he called Falcon again. On January 20, Falcon called Fiero 10 times between 9:29 a.m. and 12:29 p.m. Carlson, Falcon, and Fiero maintained frequent telephone contact for the remainder of the day after the Dorfman telecast on January 20. In total, on January 20, Carlson and Falcon exchanged 31 telephone calls, Falcon and Fiero exchanged 29 telephone calls, and Carlson called Fiero eight times.

[*52]

   n39 Fiero professed not to have liked Carlson and that there was animosity between them. Fiero, however, had significant contact with Carlson, whose firm (Aspen) held a sizeable short position in Hanover securities, in January 1995. In addition to the calls listed above, in early 1995 Fiero called Carlson's home in Idaho eight times on January 5 and also called on January 9, 11, 13, 16, and 17. There were six calls between the two on January 23, nine on January 24, five on January 25, and 15 on January 26, the day of Fiero Brothers' block purchase from Hanover, the block purchase that, according to Fiero, he took away from Carlson. Fiero also visited Carlson and spent time at his mountain cabin.

 Finally, central to the Fiero Respondents' participation in the manipulation of the market for Hanover securities was the Fiero Respondents' violation of NASD's affirmative determination requirements, which we discuss in greater detail later in this decision. By violating the affirmative determination requirements, the Fiero Respondents sold short securities that they knew could not be borrowed for delivery. As a result, the Fiero Respondents misled other market participants as to the [*53] true volume of Hanover securities being sold and the actual level of market interest in the securities.

 In sum, the Fiero Respondents' concerted actions during the first stage of the bear raid, January 19 through 26, 1995, resulted in the dissemination of inaccurate information into the marketplace for Hanover securities regarding the actual volume of securities sold, the true amount of market activity, and the current market price for the securities.

 b. *The Fiero Respondents Manipulated The Hanover Securities Market During The Second Stage Of The Bear Raid (January 27 through February 24, 1995)*

 The Fiero Respondents and other bear raid participants resumed their aggressive, manipulative short-selling campaign with even greater intensity after Fiero Brothers executed the block purchase and subsequent sales that left the short sellers nearly flat. The Fiero Respondents and the other participants re-established significant short positions in the

Hanover securities (which they knew that they could not borrow for delivery) during the second phase of the bear raid, from January 27 through February 24, in an effort further to drive down the price of the Hanover securities. The result [*54] of part two of the bear raid was that Hanover closed its doors for good.

The Fiero Respondents increased Fiero Brothers' short position value in the Hanover securities from ($ 54,356) on January 27 to ($ 119,756) as of January 30, ($ 486,400) as of February 3, ($ 1,027,041) as of February 8, and ($ 2,002,103) as of February 15. As of February 23, Fiero Brothers held a short position of 272,500 units, warrants, or shares in eight Hanover securities, valued at $ 3,233,945.

During the same period, Falcon built an extensive short position in the Hanover securities. By February 23, Falcon had amassed a short position of 733,007 units, warrants, or shares in nine Hanover securities, valued at $ 7,634,643. n40 Glen Vittor's other firm, Sovereign, also held a short position of 23,000 Hanover securities valued at $ 226,000 as of late February.

n40 On February 24, Falcon again increased its short position in Hanover securities by more than 439,000 units, warrants, or shares.

Like the Fiero Respondents, the DiPrimo account also resumed its aggressive short selling campaign on January 30, the first trading day after Fiero Brothers' block purchase. By February 23, the DiPrimo account had amassed [*55] a short position of 96,325 Hanover securities valued at $ 1,603,481. n41

n41 On February 24, the DiPrimo account also increased its short position in Hanover securities by more than 75,000 units, warrants, or shares.

Similarly, Carlson's firm (Aspen) increased its short position in Hanover securities by February 23 to 76,900 units, warrants, or shares in six Hanover securities valued at approximately $ 1,246,000. Other entities in the circle of Gurian's friends and business associates also continued the war on Hanover securities by executing more short sales. Rocena, a Bahamian limited partner of Falcon (which shared a post office box with the DiPrimo account) sold 45,000 PANXU short through Sovereign on February 13 for $ 770,625. Rocena sold another 55,000 PANXU short on February 24. Gurian's friend, AK, who previously had sold Hanover securities short through the Canadian firm Midland Walwyn, opened a new account at another broker-dealer on February 14, 1995 and immediately began heavy short selling of Hanover securities throughout the month of February. Falcon limited partner Tally, another Bahamian limited partner of Falcon (which also shared the same post office box), also [*56] sold 75,000 PANXU short on February 24. Gurian's friend, VM, sold short 48,000 PANXU for $ 820,000 in late February. Other individuals and entities with a connection to Gurian or the Bahamian entities also followed a similar short-selling pattern during part two of the bear raid.

As with the first stage of the bear raid, Fiero professed no knowledge of the identity or existence of the other short sellers. Yet, during the second stage of the bear raid, Fiero maintained constant telephone contact with Gurian, Falcon and, to a lesser extent, Carlson, Hoffman, and Glen Vittor. For instance, on January 31, the Fiero Respondents and Falcon or Gurian had 10 telephone calls. On February 7, the Fiero Respondents and Falcon or Gurian had 15 telephone calls. They had 22 telephone calls on February 8, 16 telephone calls on February 10, and 24 telephone calls on February 13. They had seven telephone calls on February 7, the day that Hanover closed its doors. We find Fiero, Falcon, and Gurian's patterns of communication, taken in consideration with the other facts in this case, to be evidence of the Fiero Respondents' involvement in a manipulation of the market for Hanover securities.

We are also [*57] persuaded of the Fiero Respondents' involvement by the inconsistencies in Fiero's memory. During deposition testimony just one year after Fiero Brothers' massive short-selling effort, in March 1996, Fiero contended that he had no idea why he had established such extensive short positions in the Hanover securities, and he claimed to recall little or nothing about any of the issuers. Fiero recalled the Dorfman broadcast, but could recall no other negative information about PANXU during the last half of January, February, and March 1995. Similarly, he

could recall no negative developments regarding the other Hanover securities that he sold short during the second half of the bear raid. For the majority of the Hanover securities, Fiero could not recall the issuers' businesses, what products they sold, new developments for the issuers, plant or headquarter locations, or the identity of their chief executive officers, presidents, or board members. Before the Hearing Panel, however, Fiero's recollection regarding the specifics of the Hanover securities had improved dramatically.

We also find telling other inconsistent statements from Fiero. At the Hearing Panel hearing, Fiero recalled that, [*58] after Fiero Brothers withdrew on January 26 and 27 as a market maker in the Hanover securities, purportedly because Fiero feared Ageloff and Hanover, the Firm started selling short again because Fiero did not think that Hanover could identify the short sellers. Fiero also testified that on February 13, he received threatening visits from Ageloff and other men who represented Hanover. Fiero testified that Ageloff sought to stop the short selling and that Fiero was so intimidated by the visit that he contacted the police and the Justice Department. Yet, after the threatening visit on February 13, Fiero Brothers continued its short selling attack on Hanover. In a four-minute period on February 13 alone, Fiero Brothers sold short 66,000 shares, warrants, or units of Hanover securities for $ 746,500. During the days after the February 13 visit, Fiero Brothers continued at a fast pace to sell Hanover securities short. Between February 13 and 23 (the days between Ageloff's threatening visit and Hanover's going out of business), Fiero Brothers executed 24 additional short sales valued at approximately $ 1,800,000. n42 Fiero's testimony that he felt threatened and intimidated by [*59] Hanover is less credible when considered in light of Fiero Brothers' significant short-selling efforts. Furthermore, notwithstanding Fiero's professed fear of Hanover, Fiero Brothers re-registered as a market maker in Hanover securities on February 24. n43

n42 In PANXU, between February 15 and 23, Fiero Brothers executed 13 short sales totaling 59,275 units for $ 1,016,063. In EVRM, between February 16 and 23, Fiero Brothers executed four short sales totaling 34,000 shares for $ 340,000. In PLCO, between February 16 and 23, Fiero Brothers executed four short sales totaling 22,800 shares for $ 302,124. In PMNR, on February 21 and 23, Fiero Brothers executed two short sales totaling 9,500 shares for $ 98,562. In ATOY, Fiero Brothers executed one short sale on February 21 of 6,500 shares for $ 55,250.

n43 Fiero Brothers' status as a market maker in Hanover securities did not affect the Fiero Respondents' short-selling scheme. Between January 27, when Fiero Brothers completed its withdrawal as a market maker from all of the Hanover securities, and February 24, when Fiero Brothers re-entered as a market maker in Hanover securities, Fiero Brothers executed 55 short sales of 309,775 shares, warrants, or units in Hanover securities.

[*60]

Finally, as with the first stage of the bear raid, central to the Fiero Respondents' participation in the manipulation of the market for Hanover securities was the Fiero Respondents' violation of NASD's affirmative determination requirements, which we discuss in greater detail later in this decision. By violating the affirmative determination requirements, the Fiero Respondents sold Hanover securities short without knowing whether they would be able to deliver those securities, thereby misleading other market participants as to the true volume of Hanover securities being transferred or sold and the actual market interest in the securities.

In sum, the Fiero Respondents' activities during the second stage of the bear raid, January 27 through February 24, 1995, resulted in the dissemination of inaccurate information into the marketplace for Hanover securities. The Fiero Respondents' concerted manipulative conduct misled the market into believing that holders of the Hanover securities or entities with access to the securities were selling when, in fact, the short sellers had created artificial market activity.

* * * *

"Investors and prospective investors ... are ... entitled to assume [*61] that the prices that they pay and receive are

determined by the unimpeded interaction of real supply and real demand so that those prices are the collective marketplace judgments that they purport to be." Edward J. Mawod & Co., 46 S.E.C. 865, 871-72 (1977), aff'd, 591 F.2d 588 (10th Cir. 1979). Frauds, like the fraud perpetrated by the Fiero Respondents, that mislead the general public as to the market value for a security affect the integrity of the securities markets as a whole and violate Rule 10b-5. See U.S. v. Russo, 74 F.3d 1383, 1390 (2d Cir. 1996) (the purpose of Section 10(b) and Rule 10b-5 is to prevent fraud, whether it is a standard type of fraud or a novel type that presents a "unique form of deception"). In sum, the Fiero Respondents participated in a market manipulation that resulted in the insertion into the market of inaccurate information regarding the Hanover securities and a deflation in the value and price of those securities.

2. The Fiero Respondents Acted With Scienter

Proof of scienter is required to establish a violation of Section 10(b), Rule 10b-5, and Rule 2120. Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976); Kevin Eric Shaughnessy [*62] , 53 S.E.C. 692 (1998). Proof of scienter is not required to find a violation of Rule 2110. Wall Street West Inc., 47 S.E.C. 677 (1981); Philip S. Sirianni, 47 S.E.C. 355 (1980).

We find that the Fiero Respondents intended to manipulate the market for Hanover securities. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst, at 193, n.12. "A knowledge of what one is doing and the consequences of his actions suffices [to prove scienter]" SEC v. Falstaff Brewing Corporation, 629 F.2d 62, 77 (D.C. Cir. 1980). Furthermore, evidence that the respondent acted with recklessness is sufficient to establish scienter. Meyer Blinder, 50 S.E.C. 1215, 1229-30 (1992). n44 Recklessness has been defined as "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." n45 Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990), cert. denied, 499 U.S. 976 (1991) [quoting Sunstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 [*63] U.S. 875 (1977)]. Thus, scienter is established in this case if the evidence shows that the Fiero Respondents knew of the manipulation or the market manipulation was so obvious to Fiero that he must have been aware of it. n46

n44 The Supreme Court has expressly reserved the issue of whether "recklessness" is sufficient to prove scienter under Rule 10b-5. See Ernst & Ernst, at 193 n.12; see also Aaron v. SEC, 446 U.S. 680, 686 n. 5 (1980). Most Circuit Courts of Appeal, however, have held that "recklessness" satisfies the Rule 10b-5 scienter requirements. See, e.g., Dirks v. SEC, 681 F.2d 824, 844-45 (D.C. Cir. 1982); see also Louis Loss & Joel Seligman, Securities Regulation, Vol. VIII, ch.9, § B(6), at 3665-67 n.521 (3d ed. 1991) (11 circuits have held that a showing of recklessness is sufficient to prove scienter).

n45 The scienter requirement under Rule 2120 also may be satisfied by a showing of intentional or reckless conduct. Kevin Eric Shaughnessy, at 696.

n46 Scienter is often established by circumstantial evidence; direct evidence is not necessary. Meyer Blinder, 50 S.E.C. 1215, 1229-30 (1992); see also Blech Sec. Lit., 961 F. Supp. 569, 582 (S.D.N.Y. 1997) (scienter can be inferred from circumstantial evidence). "Intent, like the other elements of a manipulation charge, may be inferred from the facts and circumstances of a given case because 'manipulators seldom publicize their intentions.'" Jay Michael Fertman, 51 S.E.C. 943, 949 (1994). Furthermore, even if Fiero was motivated in this case by a desire to make a profit rather than by a specific desire to drive down the price of Hanover securities, Fiero's knowing or reckless involvement in the manipulation results in the Fiero Respondents' liability under Rule 10b-5. See SEC v. U.S. Environmental, Inc., 155 F.3d 107, 112 (2d Cir. 1998) (if the respondent knowingly effected manipulative buy and sell orders, his personal motivation for manipulating the market is irrelevant to a finding of scienter).

[*64]

The evidence supports a finding of scienter. The Fiero Respondents maintained constant telephone contact with the other short sellers both before and during both phases of the bear raid. Although we do not know the substance of the telephone conversations, the timing, pattern, and number of the Fiero Respondents' contacts with the other short sellers, many of which occurred outside normal business hours, suggest that the Fiero Respondents knowingly participated in the bear raid.

Fiero's inconsistent statements and, at times, his convenient inability to recall information seemingly critical to Fiero Brothers' business interests also support our finding of scienter. The Fiero Respondents made a market and executed numerous short sales in the Hanover securities. Yet during testimony soon after the review period, Fiero asserted that he could recall nothing about the specific securities in which the Firm made a market or why he had chosen to engage in a massive short-selling effort. He also could not recall what, if any, strategy the Firm had followed in choosing to make markets in these particular securities. Indeed, during NASD investigative testimony that occurred during the year following [*65] the events at issue, Fiero could not recall even the most basic information about the Hanover securities and Fiero Brothers' strategy in these securities. Yet, years later at the Hearing Panel hearing, Fiero recalled specific facts and details about which he previously had claimed ignorance. Fiero's selective memory supports our scienter finding. See Jay Michael Fertman, 51 S.E.C. 943 (1994) (respondent's lack of candor and asserted inability to recall even the most basic information about events at issue lends support to finding of scienter).

We find Fiero's contention that he knew nothing about the details that Gurian negotiated with Hanover to be false, and we conclude that Fiero knew significant details about Gurian's negotiated deal with Hanover. Fiero contacted Moran the night before the deal, after extensive telephone contact with Gurian and Falcon, and told Moran that he knew of the impending block purchase from Hanover. When Fiero approached Hanover, his level of knowledge was astonishing. He knew which securities to purchase, how much to purchase, and, most impressively, the level of discount that Hanover was willing to give. Although Fiero claimed not to know who the [*66] short sellers were or what amounts they had sold short, he managed to purchase the number of Hanover securities from Hanover to cover his own short positions and most of the short positions of the other short sellers, leaving Fiero Brothers and the other short sellers essentially flat in the Hanover securities. Fiero also knew exactly which firms to approach to solicit purchases of the Hanover securities from Fiero Brothers. Fiero committed millions of dollars more than Fiero Brothers had in capital to a block purchase of Hanover securities (securities that Fiero claims to have believed overpriced and possibly manipulated by Hanover), yet Fiero claims that the Firm's subsequent resales were not planned and that he had no prior knowledge of the identity of the short sellers. We find Fiero's explanations to be totally lacking in credibility. We conclude that the Fiero Respondents knew about Gurian's negotiated deal and that the Fiero Respondents therefore acted knowingly.

Our finding that the Fiero Respondents acted with scienter is also buttressed by Fiero Brothers' and Mitchum Jones' withdrawal as market makers immediately after Hanover's block sale to Fiero Brothers. Fiero claims [*67] that Fiero Brothers withdrew as a market maker because he feared Hanover, yet he did not withdraw the Firm immediately from acting as a market maker in all Hanover securities, and Fiero Brothers continued to execute short sales and make discount purchases from Hanover even though Fiero supposedly feared the firm. Furthermore, Fiero Brothers re-entered as a market maker in Hanover securities in February 1995. We conclude that Fiero would not have executed an additional discounted purchase from Hanover, executed more short sales, and re-registered as a market maker in Hanover securities one month later if he indeed feared Hanover. Instead, we find that Fiero Brothers' withdrawal as a market maker supports our finding that Fiero acted knowingly and intentionally because the withdrawal was consistent with the agreement between Gurian and Hanover.

Our finding that the Fiero Respondents acted with scienter also is supported by the Fiero Respondents' failure to close out the Firm's short positions in the Hanover securities when the Firm was unable to deliver the securities. Even if, as Fiero contends, he had relied on Hard-to-Borrow lists to determine the availability of the Hanover securities, [*68] an assertion that is not supported by the record (as discussed more fully below), Fiero did not try to close out Fiero Brothers' short positions in the Hanover securities when he determined that the Firm could not borrow the securities. His failure in this regard is evidence that the Fiero Respondents sold the Hanover securities short without ever intending

to ensure that they could borrow the securities. We find this to be further evidence that the Fiero Respondents acted with scienter.

In conclusion, we find that the evidence, including Fiero's own contradictory statements, overwhelmingly supports a finding that the Fiero Respondents acted with intent or, at a minimum, recklessly. Fiero's contentions to the contrary are belied by significant evidence that shows the Fiero Respondents' knowledge of and participation in the manipulation of Hanover securities.

B. Affirmative Determination Violations

The Fiero Respondents violated the affirmative determination requirements contained in NASD's Rule 3370. Rule 3370(b)(2)(B) provides:

> No member shall effect a "short" sale for its own account in any security unless the member ... makes an affirmative determination that the member [*69] can borrow the securities or otherwise provide for delivery of the securities by the settlement date.

The affirmative determination requirements prevent short selling by those who do not have, and have no intention of delivering, the stock they are selling. The Fiero Respondents contend that they were exempt from this requirement during the first stage of the alleged bear raid, from January 20 through 26, 1995, when Fiero Brothers was a market maker in the Hanover securities, and that they complied with it during the second stage of the alleged bear raid, from January 27 through February 24, 1995, when Fiero Brothers was not a market maker. For the reasons that follow, we reject these contentions.

1. The Fiero Respondents Violated NASD's Affirmative Determination Requirements When Fiero Brothers Was Registered As A Market Maker

Fiero admitted that he did not make any affirmative determinations in connection with Fiero Brothers' short sales of the Hanover securities during the period from January 20 through January 26 (the first stage of the bear raid). The Fiero Respondents contend, however, that because Fiero Brothers was registered as a market maker in the Hanover securities [*70] during this period, they were exempt from the affirmative determination requirements, based on Rule 3370(b)(2)(B), which provides that the affirmative determination requirements will not apply to bona fide market-making transactions by a member in securities in which it is registered as a Nasdaq market maker. Enforcement contends that the market maker exemption was inapplicable because Fiero Brothers' short sales were not bona fide market-making transactions. We agree with Enforcement and affirm the Hearing Panel's finding of violation.

A review of the history of the market maker exemption demonstrates that NASD did not intend the exemption to give market makers *carte blanche* to engage in speculative short selling of securities that could not be borrowed for delivery. Rather, NASD intended the exemption to provide market makers with freedom to effect short sales when required to provide market liquidity. See Notice of Proposed Rule Change Relating to Prompt Receipt and Delivery of Securities, Exchange Act Rel. No. 26746, 1989 SEC LEXIS 713 (April 20, 1989).

In response to recommendations contained in an NASD-issued report regarding short-selling practices, NASD undertook several [*71] initiatives, one of which was to amend the Board of Governors' Interpretation on Prompt Receipt and Delivery of Securities ("the Interpretation") (predecessor to Rule 3370). See Order Approving Rule Change Relating to Close-Out Requirements for Short Sales and an Interpretation on Prompt Receipt and Delivery of Securities, Exchange Act Rel. No. 32632, 1993 SEC LEXIS 1775 (July 14, 1993). In 1989, NASD proposed amending the Interpretation to impose an "affirmative determination" requirement on member firms in order "to address unnecessary speculation in connection with the short selling of broker-dealers' proprietary positions caused by the members' ability to go short without securities to cover the short position." Exchange Act Rel. No. 26746, supra.

NASD included a market maker exemption in the proposed amendment. When the SEC approved the amendment, the SEC advised that it "expected the NASD to monitor closely the use of the exemption for bona fide market-making transactions ...." Order Approving Proposed Rule Change Relating to the Prompt Receipt and Delivery of Securities, Exchange Act Rel. No. 28186, 1990 SEC LEXIS 2713 (July 5, 1990). In 1993, the SEC revisited [*72] the market maker exemption and explained that a bona fide short sale must be related to a firm's market making:

> The Commission believes that for the qualifier "bona fide" to have any substance, it must mean more than the fact that the transactions in question are effected in a market-making account. At a bare minimum, to qualify for the exception, a market maker's short selling activity must be reasonably related to its market-making activities. In addition, the Commission believes that a bona fide market maker is a broker-dealer that deals on a [regular] basis with other broker-dealers, actively buying and selling the subject security as well as regularly and continuously placing quotations in a quotation medium on both the bid and ask side of the market.

Exchange Act Rel. No. 32632, supra, at 15 (July 14, 1993).

In August 1994, NASD issued Notice to Members ("NTM") 94-68, SEC Approves Short Sale Rule for the Nasdaq Stock Market (Aug. 24, 1994), in which it advised the membership of the adoption of a related rule, the Short Sale Rule for Nasdaq National Market Securities (now Conduct Rule 3350). n47 NTM 94-68 explained that, during the first year that the Short Sale [*73] Rule was in effect, market makers that had maintained quotations for 20 consecutive business days without interruption were exempt from the rule for short sales in that security, provided that all exempted short sales were made in connection with bona fide market-making activity. In NTM 94-68, NASD also advised member firms that NASD's Board of Governors had issued an interpretation to clarify the factors to consider when reviewing market-making activity that may not be deemed to be bona fide market-making activity and therefore not exempt from the Short Sale Rule. Although this interpretation applies expressly to the bona fide market maker exemption provision in the Short Sale Rule, it also is instructive in connection with the bona fide market maker exemption in Rule 3370, another rule designed to regulate short sales. Consistent with the SEC's 1993 release, the interpretation (currently set forth as IM-3350) explains that:

> bona fide market-making activity does not include activity that is unrelated to market-making functions ... bona fide market making would exclude activity that is related to speculative selling strategies of the member or investment decisions of the firm [*74] and is disproportionate to the usual market-making patterns or practices of the member in that security. [NASD] does not anticipate that a firm could properly take advantage of its market maker exemption to effectuate such speculative or investment short selling decisions. Disproportionate short selling in a market-making account to effectuate such strategies will be viewed by [NASD] as inappropriate activity that does not represent bona fide market making.

> n47 As adopted in 1994, the Short Sale Rule prohibited member firms from effecting short sales at or below the current inside bid whenever the bid was lower than the previous inside bid. This requirement is also known as the "bid test."

Applying these standards, we find that the Fiero Respondents were not entitled to the market maker exemption for Fiero Brothers' short sales of Hanover securities during the period from January 20 through 26, 1995, even though Fiero Brothers was registered as a market maker. Fiero Brothers' short sales during this period did not represent bona fide market-making transactions, but rather, were designed to carry out Fiero's speculative trading strategies.

Our findings are based on several factors. [*75] First, Fiero Brothers had no history as a market maker in the Hanover securities. Fiero Brothers did not register as a market maker in the Hanover securities until January 19 and then maintained its market maker registration only until January 26 or 27. Because Fiero Brothers made markets for just one

week, the Firm had not established any usual market-making patterns or practices as of January 20, n48 the day of the Dorfman broadcast, when Fiero Brothers began short selling significant amounts of Hanover securities. Thus, Fiero Brothers had no history of market making in the Hanover securities on which to establish its usual market-making practices in the Hanover securities.

n48 The Fiero Respondents argue that the Hearing Panel wrongly rejected evidence of the Firm's market-making patterns in other securities in which it made markets. We do not agree. NTM 94-68, supra, provides that bona fide market-making activity may include trading activity that is not disproportionate to the market maker's usual market-making patterns or practices in the security at issue.

Furthermore, our review of Fiero Brothers' trading indicates that the Fiero Respondents were engaged in speculative [*76] trades, both while the Firm was a market maker and after. The Fiero Respondents' apparent trading strategy of ending the day holding significant short positions in Hanover securities was not confined to the period when Fiero Brothers was registered as a market maker in Hanover securities. By the end of the day on January 20 (the first trading day after Fiero Brothers had registered as a market maker), Fiero Brothers had established a short position in the Hanover securities valued at nearly $ 577,000. By the end of the day on January 25, Fiero Brothers' last day as a market maker, it had increased the value of its aggregate short position to approximately $ 1.2 million. n49 This "strategy" continued well after Fiero Brothers withdrew as a market maker on January 26. Fiero Brothers withdrew as a market maker in the Hanover securities on January 26 and 27, yet continued to establish significant day-end short positions in the Hanover securities. Fiero Brothers' strategy of selling Hanover securities short was demonstrably unrelated to its registration as a market maker.

n49 The Fiero Respondents assert that the Firm sometimes ended days holding long positions in the Hanover securities. The record indicates otherwise, particularly with respect to the days during which the Firm was registered as a market maker in the Hanover securities.

[*77]

Additionally, Fiero initially denied that, in establishing such significant short positions as a market maker, he was following a particular market-making strategy. During NASD investigative testimony in May 1995, just four months after the events at issue, Fiero testified that he did not have a strategy with respect to making a market in the Hanover securities and selling them short. Indeed, Fiero could not even recall what had made him decide to become a market maker in the first instance and subsequently sell the Hanover securities short. n50

n50 At the Hearing Panel hearing, which occurred in October 1999, more than four years after the events at issue, Fiero claimed that Fiero Brothers sold short after January 20 because he was "anticipating a second wave of selling" in the Hanover securities. In light of Fiero's inability to recall his prediction of a wave of selling just months after the events at issue occurred, the Hearing Panel found that the Firm's short sales were speculative in nature, that Fiero Brothers' short sales were not bona fide market-making transactions, and that Fiero Brothers did not qualify for the bona fide market maker exemption. Furthermore, after having had an opportunity to observe Fiero as he testified at the hearing, the Hearing Panel concluded that Fiero's hearing testimony was not credible. We affirm the Hearing Panel's determination to discredit Fiero's testimony in this regard. As stated earlier, the SEC consistently has held that the credibility determinations of the initial fact-finder are entitled to considerable weight and deference. See Jon R. Butzen, 52 S.E.C. 512 (1995); Jonathan Garrett Ornstein, 51 S.E.C. 135 (1992). Moreover, as discussed above, Fiero's testimony is inconsistent with other evidence in the record, including his own prior testimony immediately following the events at issue and the trading pattern that Fiero Brothers followed even when it was not registered as a market maker in the Hanover securities.

[*78]

In sum, we find that the Fiero Respondents, in effecting short sales in the Hanover securities during the period

when Fiero Brothers was registered as a market maker, were engaged in speculation, not bona fide market-making transactions, and were not entitled to the market maker exemption to Rule 3370.

   2. The Fiero Respondents Violated NASD's Affirmative Determination Requirements When Fiero Brothers Was Not Registered As A Market Maker

   The Fiero Respondents violated the affirmative determination requirements during the second stage of the bear raid, from January 27 through February 24, 1995, when Hanover went out of business and Fiero Brothers re-registered as a market maker in the Hanover securities. During this period, Fiero Brothers was not registered as a market maker in the Hanover securities, yet it engaged in an aggressive short-selling strategy that resulted in a short position in the Hanover securities of more than $ 3.2 million as of February 23. The Fiero Respondents contend that they met NASD's affirmative determination requirements by relying on "Hard-to-Borrow" lists issued weekly by Fiero Brothers' clearing firm, Spear, Leeds & Kellogg ("Spear Leeds"), that Fiero [*79] believed that Joseph Roberts & Co., Inc. ("Joseph Roberts"), a member firm that had hired many of Hanover's registered representatives (and whose customers owned many of the Hanover securities), would be able to lend the Hanover securities to Fiero Brothers, and that the reliability of blanket assurances as a means of satisfying the affirmative determination requirements was unclear at the time. We reject the Fiero Respondents' arguments.

   We begin with an overview of the applicable standards at the time. In September 1994, the SEC approved an amendment to the Interpretation (precursor to Rule 3370) requiring, for the first time, that firms annotate affirmative determinations on trade tickets or other firm records. Order Approving Proposed Rule Change Amending the Prompt Receipt and Delivery of Securities Interpretation Relating to Short Sales, Exchange Act Rel. No. 34653, 1994 SEC LEXIS 2859 (Sept. 12, 1994). In the release, the SEC noted that the affirmative determination requirements apply to every transaction and a "blanket" or standing assurance that securities are available for borrowing was not acceptable to satisfy the requirement. Id.

   In November 1994, NASD announced [*80] approval of the amended interpretation in NTM 94-80, SEC Approves NASD Proposal Requiring Members to Annotate Their Affirmative Determinations as to Stock Availability Made in Connection With Short Sales (Oct. 1994). In NTM 94-80, NASD explained that it had adopted the annotation requirement in order "to enhance member firm compliance with the affirmative determination requirements" and to improve the effectiveness of NASD's ability to monitor member firms for compliance. NTM 94-80 states that, through this rule change, NASD "made clear its longstanding policy that firms cannot rely on daily fax sheets of 'borrowable stocks' to satisfy their affirmative determination requirements [under Rule 3370]."

   NASD originally scheduled the effective date for the annotation requirement for November 30, 1994, but later postponed it to January 9, 1995. On January 6, 1995, however, NASD issued a Special NTM, in which it authorized member firms to rely on "daily fax sheets from their clearing firms as a basis for making their affirmative determinations made in connection with short sales" until August 1, 1995 (emphasis added). On January 10, 1995, the SEC confirmed the NASD's postponement [*81] of the effectiveness of the rule change. Effective Date of an Amendment to the Prompt Receipt and Delivery of Securities Interpretation Concerning Affirmative Determinations Made in Connection With Short Sales, Exchange Act Rel. No. 35207, 1995 SEC LEXIS 46 (Jan. 10, 1995). In February 1995, NASD published a "For Your Information" bulletin stating, "members may rely on daily fax sheets and other 'blanket' or standing assurances to satisfy the new annotation requirement until August 1, 1995" (emphasis added). In our view, as of January 1995, the Fiero Respondents were entitled to rely on daily sheets from the Firm's clearing firm or other assurances of availability, and they had to document their compliance with NASD's affirmative determination requirements.

   The Fiero Respondents did not comply with these requirements. First, we reject Fiero's testimony that he relied on Spear Leeds' weekly Hard-to-Borrow lists. The record contains no evidence of Fiero Brothers' contemporaneous records documenting such reliance and the Hearing Panel found Fiero's testimony on this point not credible. n51 Again, we defer to the Hearing Panel's credibility determinations because "credibility [*82] determinations of the initial

fact-finder are entitled to considerable weight and deference, since they are based on hearing the witnesses' testimony and observing their demeanor." Ashvin R. Shah, 52 S.E.C. 1100, 1103 (1996). Furthermore, other persuasive evidence supports the Hearing Panel's credibility findings. Fiero testified in NASD investigative testimony in September 1996, more than three years before his hearing testimony, that he believed that he "might have reviewed [Spear Leeds' weekly Hard-to-Borrow lists]," but that he did not know specifically what he had done. He further testified in September 1996 that, given the time that had elapsed between the January 1995 trades and his September 1996 testimony, he could not possibly recall what he did exactly, particularly since he did not recall recording or documenting his affirmative determinations in any manner and since he did not recall considering himself or the Firm to be under any obligation at the time to document affirmative determination requirements.

n51 At the Hearing Panel hearing, Fiero testified that he recalled relying on lists that Spear Leeds issued weekly or periodically in connection with every short sale of the Hanover securities during the relevant period.

[*83]

Fiero's credibility is further undermined by the content of the very lists on which he claims to have relied. Spear Leeds' weekly list for January 23, 1995 included MRJY among securities that were generally unavailable for borrowing, yet the Fiero Respondents sold MRJY short on January 27, after the Firm had withdrawn as a market maker. If, as Fiero contended, he had consulted and relied upon Spear Leeds' list before every short sale, he would have seen MRJY listed, and he should not have sold the security short. Similarly, Spear Leeds' February 6, 1995 weekly list included APROU as a security that was generally unavailable for borrowing, but Fiero made short sales of APROU on February 7 and 8. Spear Leeds also listed "warrants" generally as unavailable for borrowing during the entire relevant period, yet the Fiero Respondents sold warrants short. The Fiero Respondents sold ATOYZ short on February 8 and 13 and PLCOW short on February 24. Either Fiero did not consult the lists before making these sales or he did consult the lists, but sold these securities short anyway. In either case, the evidence lessens Fiero's credibility and contradicts his contention that he relied on Spear Leeds' [*84] Hard-to-Borrow Lists.

In any event, even if the evidence had demonstrated that the Fiero Respondents did, in fact, rely on Spear Leeds' Hard-to-Borrow lists (which we find it did not do), such reliance would not have been reasonable and would not have been sufficient to comply with NASD's affirmative determination requirements. Although NASD's interpretation of member firms' affirmative determination requirements was evolving during the relevant period, the record demonstrates that in January and February 1995, member firms were entitled to rely, at most, on "daily fax sheets" or other forms of "'blanket' or other standing assurances." In our view, the Fiero Respondents were entitled to rely only on daily positive assurances from Spear Leeds that the Hanover securities would be available for borrowing by settlement date, not on implied assurances of availability gleaned from a security's absence from Spear Leeds' weekly Hard-to-Borrow list, which purported merely to list specific securities or, as in the case of warrants, types of securities that were "generally 'unavailable' for loan." We do not find that it was reasonable for the Fiero Respondents to have concluded from this [*85] list that Spear Leeds was giving an "assurance" that any of the thousands of other Nasdaq, exchange, and over-the-counter securities not on the list would be available for borrowing to cover short sales. Furthermore, the very first page of each Spear Leeds list stated: "Please check with stock loan department about availability of a security prior to making a commitment." Fiero did not check with Spear Leeds' stock loan department prior to effecting short sales in the Hanover securities, and he did not comply with NASD's affirmative determination requirements.

Fiero also claimed to have relied for the Firm's affirmative determinations on assurances from the president of Joseph Roberts "that a lot of [the Hanover securities] were coming over" to Joseph Roberts and would be available to fill Fiero Brothers' short sales. According to Fiero, Roberts expected these Hanover securities to appear as long positions in the accounts of customers of former Hanover representatives who Joseph Roberts subsequently hired. n52 We do not find that the Fiero Respondents' alleged reliance on assurances from Joseph Roberts satisfied their affirmative determination obligations. First, like the Hearing [*86] Panel, we do not find credible Fiero's hearing testimony that he relied on assurances from Joseph Roberts. Fiero admitted that he had never mentioned Joseph Roberts' alleged assurances during his investigative testimony, which occurred much closer in time to the events at issue, and the

letter from Joseph Roberts that Fiero offered to support his contention is dated months after the short sales in question. Furthermore, if the Fiero Respondents had received and intended to rely on Joseph Roberts' assurances, they were required at the time of the short sales to annotate, on the trade ticket or on some other Firm record, the identity of the individual and firm who offered assurance. See Exchange Act Rel. No. 34653, supra; Exchange Act Rel. No. 35207, supra; NASD Special NTM (Jan. 6, 1995). Fiero admitted that he did not make any such annotations. Finally, notwithstanding Fiero's failure to observe the annotation requirements, Joseph Roberts' vague representation that "in January and February" it expected to receive the accounts of former Hanover customers who it expected held long positions in the Hanover securities would not have satisfied the requirement that, for each  [*87]  short sale, the Fiero Respondents affirmatively determine that Fiero Brothers could borrow or otherwise provide for delivery of the securities by settlement date.

> n52 To support Fiero's testimony, the Fiero Respondents offered as evidence a May 11, 1995 letter from Joseph Roberts to Fiero, which confirmed that "in January and February of [1995]," Joseph Roberts had represented to Fiero that it expected to have enough Hanover securities to fill Fiero Brothers' short positions once customers of former Hanover representatives transferred their accounts to Joseph Roberts. According to the letter, Joseph Roberts was unable to cover Fiero Brothers' short positions because Adler Coleman's failure prevented the transfer of customer accounts.

In sum, the Fiero Respondents did not comply with NASD's affirmative determination requirements during the period when the Firm was not registered as a market maker.

* * * *

We find that the Fiero Respondents violated Rules 2110 and 3370 in connection with short sales of the Hanover securities during both the periods between January 20 and 26, 1995, when Fiero Brothers was registered as a market maker, and between January 27 and February 23, 1995,  [*88]  when Fiero Brothers was not registered as a market maker. n53

> n53 In light of the Hearing Panel's other findings of violation, the Hearing Panel found it unnecessary to reach any conclusion regarding the Fiero Respondents' short sales outside of the period from January 20 through February 23. Given the Hearing Panel's determination not to address short sales outside of this period, we too have confined our findings regarding the Fiero Respondents' affirmative determination violations to January 20 through February 23, 1995.

C. Procedural Arguments

The Fiero Respondents raise myriad procedural arguments and contend that NASD treated them unfairly. Section 15A(h)(1) of the Exchange Act requires that NASD proceedings be fair. Sundra Escott-Russell, Exchange Act Rel. No. 43363, 2000 SEC LEXIS 2053 (Sept. 27, 2000). We find that NASD afforded the Fiero Respondents procedural fairness, and we reject the Fiero Respondents' arguments in this regard. In any event, our de novo review of the record would correct any procedural unfairness by affording the Fiero Respondents a full and fair opportunity on appeal to defend themselves. See Randolph K. Pace, 51 S.E.C. 361, 372 (1993).  [*89]

1. Motion To Adduce Expert Testimony

The Fiero Respondents argue that the Hearing Panel erred in disallowing their request to adduce expert testimony regarding the requirements of NASD's affirmative determination rule and the elements of market manipulation. We disagree.

Procedural Rule 9263 states that a Hearing Officer shall receive relevant evidence and may exclude all evidence

that is irrelevant, immaterial, unduly repetitious, or unduly prejudicial. The Rule grants the Hearing Officer broad discretion to accept or reject evidence. Since NASD is a self-regulatory organization, Hearing Panel members often have industry experience, and the Hearing Officer's discretion to accept or reject expert testimony is particularly broad. See Meyer Blinder 50 S.E.C. 1215, 1222 (1992) (NASD hearing panels have sufficient knowledge and expertise to render a businessman's judgment without the aid of expert testimony); Hamilton Bohner, Inc., 50 S.E.C. 125 (1989) (NASD is an expert body whose businessman's judgment may be brought to bear in reaching a decision). Adjudicators have "broad discretion in determining whether to admit or exclude evidence, and 'this is particularly true in [*90] the case of expert testimony.'" Pagel, Inc. 48 S.E.C. 223, 230 (1985), aff'd sub nom. Pagel, Inc. v. SEC, 803 F.2d 942 (8th Cir. 1986). The Hearing Panel did not abuse its discretion or otherwise prejudice the Fiero Respondents when it rejected the Fiero Respondents' proffer of expert testimony.

The expert testimony that the Fiero Respondents sought to admit involved legal conclusions, which are not properly the subject of expert testimony. The Fiero Respondents sought to offer expert testimony regarding the requirements during the period at issue for compliance with NASD's affirmative determination rule. Specifically, their experts sought to address the issues: (1) what is bona fide market-making activity, and (2) whether the Fiero Respondents could rely on hard-to-borrow lists to satisfy affirmative determination requirements. The Fiero Respondents also sought to offer expert testimony regarding the elements of proof necessary to establish market manipulation. n54 While, in certain instances, expert testimony regarding accepted industry practice may be helpful to evaluate a respondent's conduct, testimony like that offered here -- testimony that encompasses an ultimate legal [*91] conclusion based upon the facts of a case -- is not admissible. See Marion Bass Securities Corp., 1998 SEC LEXIS 2690 (Nov. 13, 1998) (Order Ruling on Motion to Exclude Expert Testimony). The expert testimony that the Fiero Respondents sought to offer addressed the legal requirements of NASD's affirmative determination rule and the legal elements of market manipulation, both of which are legal standards and are not appropriate topics for expert testimony. See U.S. v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991), cert. denied, 502 U.S. 813 (1991) (although an expert may opine on an issue of fact, he may not give testimony stating ultimate legal conclusions). On these issues, the lawyers for the parties, not expert witnesses, had the task of arguing to the Hearing Panel what the applicable legal standards were.

n54 The Fiero Respondents also listed in their motion to adduce expert testimony several general topics on which they sought to offer expert testimony, such as short selling, market making, small-cap securities, clearing firms, net capital, and block trading. We have considered the Hearing Panel's exclusion of expert testimony with respect to these general areas and, given that NASD is a self-regulatory organization with experienced Hearing Panel members, we do not find that the Fiero Respondents were prejudiced by their inability to present expert testimony on these general subjects.

[*92]

Furthermore, the NASD Hearing Panel, which included industry members, issued a detailed decision that demonstrates that the Hearing Panel understood the issues and the state of the law with respect to those issues. n55

n55 A careful review of the Hearing Panel decision demonstrates that the Hearing Panel rejected the Fiero Respondents' defenses not because it did not understand the issues before it or the applicable law, but because it did not believe that the evidence supported the Fiero Respondents' defenses.

Thus, the Hearing Panel appropriately rejected the Fiero Respondents' request to adduce expert testimony, and the Hearing Panel's ruling in this regard did not prejudice the Fiero Respondents.

2. Motions To Disqualify Hearing Panel Member And NAC Subcommittee Member

The Fiero Respondents contend that they were prejudiced by the Hearing Officer's failure to disqualify one member of the Hearing Panel and by the inclusion on the NAC Subcommittee of an individual whose firm had executed trades in the Hanover securities during the period at issue. We do not find that disqualification was necessary in either instance.

Both Procedural Rule 9234, which applies to Hearing Panels,  [\*93]  and Procedural Rule 9332, which applies to NAC Subcommittees, provide that a member of a Hearing Panel or a NAC Subcommittee may be disqualified if a conflict of interest or bias exists or circumstances otherwise exist where the fairness of the Hearing Panel or Subcommittee member may reasonably be questioned. n56 In developing this standard, NASD relied heavily on the conflict of interest standard that is applicable to federal judges. Proposed Changes in the By-Laws of the NASD, NASD Regulation, Inc., the Nasdaq Stock Market, Inc., the Plan of Allocation and Delegation of Functions by the NASD to Subsidiaries, Membership Application Procedures, Disciplinary Proceedings, Other Proceedings, and Other Conforming Changes, Exchange Act Rel. No. 38545, 1997 SEC LEXIS 959 (May 8, 1997). Thus, the correct test for a recusal motion is "whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal [is] sought would entertain a significant doubt that justice would be done in the case." Pepsico, Inc. v. McMillan, 764 F.2d 458, 460 (7th Cir. 1985). n57

n56 Both Rules require that requests to disqualify be based upon reasonable, good faith beliefs that a conflict of interest exists and must be accompanied by an affidavit setting forth in detail the facts alleged to constitute grounds for disqualification. The Fiero Respondents' motion to disqualify a member of the Hearing Panel did not conform to the requirements of the rule. Our decision on this issue, however, is based on the substantive merits of the Fiero Respondents' arguments and not on the procedural deficiencies in their motion.

[\*94]

n57 SEC decisions in appeals of NASD disciplinary matters also provide significant guidance in this area. For instance, the SEC consistently has rejected motions to disqualify based on the following arguments: that a respondent's competitor sits as an adjudicator; that one member of the adjudicatory panel previously considered respondent's settlement offer in the same case; that one member of the adjudicatory panel previously had served on a panel in an earlier disciplinary proceeding against the respondent; and that members of the adjudicatory panel were not associated with firms of the same size and business mix as respondent's firm. Keith DeSanto, 52 S.E.C. 316, 322 (1995); R. B. Webster Investment, Inc., 52 S.E.C. 288 (May 23, 1995); Rita H. Malm, 52 S.E.C. 64, 75 (1994); Conrad Lysiak, 51 S.E.C. 841 (1993). By contrast, in Datek Securities Corporation, 51 S.E.C. 542 (1993), the SEC stated that individuals with a substantial pecuniary interest in legal proceedings should not adjudicate those proceedings and that "a person cannot be permitted to participate on an adjudicatory hearing panel in any proceeding in which that person, or the firm at which that person is employed, may be perceived to be a victim of, or participant in, conduct that is the basis for the respondent's alleged wrongdoing." 51 S.E.C. at 544-45.

[\*95]

*a. Motion To Disqualify Hearing Panel Member*

The Fiero Respondents argue that the Hearing Officer erred in refusing to disqualify a Hearing Panel member who previously had served on the hearing panel for a prior NASD enforcement action against Falcon, Glen Vittor, and Gurian. The Fiero Respondents also argue that the Hearing Panel member should have been disqualified because of his prior service on the Market Surveillance Committee ("MSC") (now the Market Regulation Committee), during which the MSC issued an unrelated complaint against Fiero, and the Panel Member may have been exposed to prejudicial information regarding Hanover, Adler Coleman, or Fiero. We do not find that the Hearing Officer's refusal to disqualify the Hearing Panel member prejudiced the Fiero Respondents.

The record is devoid of any evidence that the Hearing Panel member had any preconceived ideas regarding Fiero, either from service on the hearing panel in the Falcon case or by virtue of the prior service on the MSC. First, with respect to knowledge that the Hearing Panel member gleaned from the Falcon case, we note that evidence appropriately considered in this case included Central Registration Depository [\*96]  ("CRD") information regarding Falcon and Glen

Vittor, which contained a recitation of NASD's findings in the Falcon case. Indeed, the record is replete with evidence of Gurian's involvement with Falcon, including Fiero's own testimony that Gurian answered Falcon's trading desk phone. Furthermore, with respect to information gleaned from MSC service, we note that the Hearing Panel member left the MSC before the MSC's issuance of a prior disciplinary action against Fiero, and there is no evidence that the Hearing Panel member was otherwise exposed to potentially prejudicial information regarding other entities involved in this case while serving on the MSC. Thus, we find that the Hearing Officer appropriately rejected the Fiero Respondents' motion to disqualify a member of the Hearing Panel.

b. *Motion To Disqualify NAC Subcommittee Member*

The Fiero Respondents also sought on appeal to disqualify a member of the NAC Subcommittee. They argued that the firm with which the Subcommittee member is associated executed trades in the Hanover securities during the period corresponding with the alleged bear raid. The Fiero Respondents contended that, since they are alleged to have manipulated [*97] the market for the Hanover securities, if the allegations are correct, the Subcommittee member's firm or its customers were victims of respondents' alleged misconduct and, under Datek, prejudiced against the Fiero Respondents. We do not find that the Subcommittee member should be disqualified. n58

n58 Before the NAC Subcommittee hearing in this case, the NAC Vice Chair considered and rejected the Fiero Respondents' Motion for Disqualification. We have reviewed the Vice Chair's ruling and adopt it as our own.

We do not find that the Subcommittee member's firm was a victim of the Fiero Respondents' alleged misconduct. First, holders of the Hanover securities may have suffered when Hanover and its clearing firm ceased operations in late February, but the evidence does not demonstrate that the Subcommittee member's firm suffered losses of this nature. The evidence indicates that many of the Subcommittee member's firm's purchases and sales occurred in March, after Hanover filed bankruptcy. Second, the Subcommittee member's firm executed all of the Hanover securities trades on an agency basis, suggesting that the firm did not maintain a position in the Hanover securities. Finally, [*98] the record indicates that, during January, February, and March 1995, the Subcommittee member's firm was one of approximately 438 firms that executed trades in the Hanover securities, and the firm executed approximately 53 purchase and 26 sales transactions on an agency basis. The size and number of trades at issue were relatively minor for the Subcommittee member's firm, which is a relatively large firm. In total, the evidence suggests that the Subcommittee member's firm had an insubstantial pecuniary interest in the Fiero Respondents' alleged misconduct and correspondingly the outcome of this disciplinary action. Thus, we reject the Fiero Respondents' motion to disqualify a member of the NAC Subcommittee.

* * * *

We therefore reject the Fiero Respondents' arguments regarding procedural irregularities involving the make-up of the Hearing Panel and NAC Subcommittee.

3. Motion To Exclude Catoggio's Investigative Testimony

The record includes transcripts of a February 1995 SEC staff interview and a May 1995 NASD interview of Catoggio (Hanover's trader). The Fiero Respondents contend that the Hearing Panel erred in accepting these transcripts into the record, since they had no opportunity [*99] to cross-examine Catoggio, thereby violating the Confrontation Clause of the U.S. Constitution. (Catoggio was imprisoned at the time of the Hearing Panel hearing and therefore did not appear.) We do not find that the Fiero Respondents were prejudiced.

Procedural Rule 9263 states that a Hearing Officer shall receive relevant evidence and may exclude all evidence that is irrelevant, immaterial, unduly repetitious, or unduly prejudicial. The Hearing Panel did not abuse its discretion in accepting the Catoggio transcripts into evidence because the transcripts are relevant to the proceeding, and the Hearing

2002 NASD Discip. LEXIS 16, *99

Panel carefully assessed their reliability.

At the outset, we note that NASD is not a state actor and constitutional and common law due process requirements therefore do not apply to NASD proceedings. First Jersey Securities, Inc. v. Bergen, 605 F.2d 690, 698-99 (3d Cir. 1979), cert. denied, 444 U.S. 1074 (1980); Desiderio v. NASD, 2 F. Supp. 2d 516, 519 (S.D.N.Y. 1998), aff'd 191 F.3d 198 (2d Cir. 1999), cert. denied 531 U.S. 1069 (2001). The SEC has held that hearsay statements, like those contained in the Catoggio transcripts, may be admitted as evidence and, [*100] in the appropriate case, may even form the sole basis for findings of fact. Charles E. French, 52 S.E.C. 858, 862 (1996); Carlton Wade Fleming, 52 S.E.C. 409, 411 (1995). The Hearing Panel appropriately admitted the Catoggio transcripts into the record, and before relying on them, properly assessed their reliability and probative value. See Richard G. Strauss, 50 S.E.C. 1316, 1320 (1992) (the reliability and probative value of hearsay evidence must be carefully assessed). In assessing the reliability of the Catoggio transcripts, the Hearing Panel considered Catoggio's possible bias and credited his testimony only when the Hearing Panel found it to be internally consistent and consistent with other evidence, such as Moran's testimony, telephone records, trading records, and Fiero's own testimony regarding Gurian's involvement with Falcon. The Hearing Panel also correctly noted that Catoggio's testimony before SEC staff was sworn and that his testimony before NASD staff, although unsworn, was transcribed by a court reporter and provided pursuant to NASD Rules that specifically required Catoggio to provide truthful testimony. Thus, the Hearing Panel properly assessed the amount [*101] of weight to give the transcripts.

We find that the Hearing Panel properly admitted the Catoggio transcripts into evidence.

4. Motion To Exclude Fiero's Prior Investigative Testimony

The Fiero Respondents sought to exclude from evidence Fiero's May 1995 and September 1996 investigative testimony before NASD staff, which differed significantly from Fiero's testimony before the Hearing Panel. The Fiero Respondents argue that NASD staff exceeded its authority in deposing Fiero and that it was not proper for the Hearing Panel to enter the transcripts of his testimony into evidence. We reject this argument.

By way of background, we first discuss the circumstances under which Fiero provided NASD staff with testimony. In 1995 and 1996, NASD's Market Surveillance Department had commenced an investigation into the facts currently before us. As part of the investigation, NASD requested that Fiero submit to an interview in May 1995, which he did. At the conclusion of the interview, NASD staff requested that Fiero return to complete the interview in January 1996. Fiero's counsel placed certain conditions on NASD with respect to Fiero's second day of testimony. When NASD staff refused to comply [*102] with the conditions, Fiero refused to return to testify in January 1996. In February 1996, the MSC issued a disciplinary complaint against Fiero for his failure to testify in January 1996. The MSC censured, fined and barred Fiero for refusing to testify, with the proviso that if he appeared to testify, the bar would be reduced to a six-month suspension. Thereafter, Fiero appeared and testified in September 1996. Fiero appealed the MSC's decision to us. In March 1997, we affirmed the MSC's findings and reduced the bar to a suspension, since Fiero had testified in September. See John J. Fiero, Complaint No. CMS960012, 1997 NASD Discip. LEXIS 29 (NBCC Mar. 10, 1997). The SEC affirmed our decision. See John J. Fiero, 53 S.E.C. 434 (1998). Fiero appealed to the Second Circuit Court of Appeals. In January 1999, the Second Circuit issued a decision not for publication ruling that, under the unique circumstances of the case, Fiero was justified in believing that his submission to an investigative interview was voluntary and that he therefore could submit to it subject to conditions. Fiero v. SEC, No. 98-4103 (2d Cir. Jan. 20, 1999). n59

n59 Fiero believed that the MSC had issued the request that he appear to testify in January 1996. Under NASD Rules, as they read at the time, the MSC did not have authority to compel member testimony. In fact, staff of the Market Surveillance Department, which did possess the authority to issue the request, had issued the request. Thus, Fiero's belief that his actions were voluntary was mistaken.

[*103]

We do not find that, based on the Second Circuit's decision, NASD staff improperly obtained Fiero's testimony or that the Hearing Panel erred in admitting transcripts of the testimony into the record. First, the Second Circuit decision concerned Fiero's refusal to testify in January 1996, not his May 1995 or September 1996 testimonies, which according to Fiero, he believed to have been provided voluntarily. Second, the Second Circuit's decision did not state that NASD staff wrongfully compelled Fiero's testimony. Rather, it stated that Fiero was justified in believing that his appearance had been voluntary. We therefore do not believe that the Hearing Panel's acceptance into evidence of the transcripts of Fiero's investigative testimony was inappropriate. See Joseph Barbera, Exchange Act Rel. No. 43528, 2000 SEC LEXIS 2396 (Nov. 7, 2000) (admission into evidence of respondent's prior admissions is not hearsay and is proper in an NASD proceeding). In any event, our conclusions in this case are not based solely on our reliance on Fiero's prior investigative testimony and, as discussed above, are supported by other record evidence.

Thus, we find that the Hearing Panel appropriately [*104] admitted the transcripts of Fiero's prior testimony into evidence and that the Fiero Respondents were not prejudiced in this regard.

5. The Proper Standard Of Proof

The Fiero Respondents assert that, since this case involves allegations of fraud and, if the Hearing Panel decision is affirmed, Fiero will lose his livelihood, the Hearing Panel erred in holding that the applicable standard of proof was preponderance of the evidence rather than clear and convincing evidence. We find that the Hearing Panel applied the appropriate standard of proof.

The Supreme Court has held that in SEC disciplinary proceedings, the correct standard of proof to apply is the preponderance of the evidence. Steadman v. SEC, 450 U.S. 91, 92 (1981). The same standard of proof is used in NASD disciplinary proceedings. Wall Street West, Inc. v. SEC 718 F.2d 973, 974 (10th Cir. 1983). Furthermore, the SEC repeatedly has upheld NASD disciplinary cases in which NASD has imposed a bar. See Jay Michael Fertman, 51 S.E.C. 943 (1994) (bar upheld where NASD met preponderance of the evidence standard).

We therefore reject the Fiero Respondents' argument in this regard.

6. The Fiero Respondents' Argument [*105] That The Hearing Panel Constructively Amended The Complaint

The Fiero Respondents argue that the Hearing Panel constructively amended the complaint in two areas: (1) the Hearing Panel based its finding of manipulation on a theory of fraud that was not alleged in the complaint -- omission of a material fact; and (2) the Hearing Panel found a violation of Rule 2110 for extortion separate from its finding of manipulation. The Fiero Respondents argue that the complaint does not allege fraud based on the theory of a failure to disclose, as the Hearing Panel found. The Fiero Respondents also argue that the complaint does not contain an allegation of an ethical violation of extortion (the Hearing Panel's Rule 2110 violation finding) and that the complaint does not allege a cause of action for extortion separate from the manipulation charge. The Fiero Respondents argue that Enforcement's failure to provide the respondents with notice and a reasonable opportunity to defend these allegations constitutes an improper constructive amendment of the complaint and that the Hearing Panel's findings therefore must be reversed. We disagree.

"Section 15A(h)(1) requires that specific charges be brought, [*106] that notice be given of such charges, that an opportunity to defend against such charges be given, and that a record be kept." Sundra Escott-Russell, Exchange Act Rel. No. 43363, 2000 SEC LEXIS 2053 (Sept. 27, 2000) at 7. The standard for adequate notice included in Procedural Rule 9212 requires that a complaint specify in reasonable detail the alleged misconduct and the rule or regulation that the respondent is alleged to have violated. We find that the Fiero Respondents had sufficient notice of all of the allegations.

First, the Hearing Panel decision does not find fraud based solely on an omission. The Hearing Panel's primary bases for finding fraudulent manipulation were extortion and participation in a concerted effort to sell short securities that could not be borrowed for delivery for the purpose of driving down the prices of those securities, both of which are

alleged in the complaint. Although the decision finds that the Fiero Respondents omitted a material fact when they failed to disclose to the market that prices for the Hanover securities were artificially depressed, the Hearing Panel decision also finds manipulation and fraud based on short selling securities that [*107] could not be borrowed for delivery and collusive activity. Moreover, we see no material difference between the Hearing Panel's finding that the Fiero Respondents violated Rule 10b-5 because their participation in a bear raid injected false information into the market and its finding that they violated Rule 10b-5 because their failure to disclose their bear raid meant that they misrepresented the truth. See SEC v. Zanford, 535 U.S.   , 122 S. Ct. 1899, 2002 U.S. LEXIS 4023 (2002) (finding that "any distinction between omissions and misrepresentations is illusory" when categorizing a Rule 10b-5 violation where a fiduciary failed to disclose that he was misappropriating funds as opposed to affirmatively misrepresented that he was not misappropriating funds). Like the Hearing Panel, we too find manipulation based on collusive trading activity, short selling securities that could not be borrowed for delivery, and a "bear raid," as alleged in the complaint. Thus, the Fiero Respondents have not been prejudiced by the Hearing Panel's reference in its decision to a material omission.

Similarly, with respect to the Rule 2110/extortion issue, the complaint adequately alleges that the [*108] Fiero Respondents' manipulative conduct also violated Rule 2110. In any event, the Hearing Panel's finding of a Rule 2110 "extortion" violation, which is not alleged in the complaint, is cured at this level in that we have not found a separate "extortion" violation of Rule 2110. We find a violation of Rule 2110 based on the Fiero Respondents' participation in a manipulation of the market for Hanover securities and their affirmative determination violations. Additionally, based on the Fiero Respondents' pleadings and oral arguments in this matter, we find that they were fully familiar with the allegations against them and that they had adequate opportunity to defend themselves. See Orion Securities, Inc., 52 S.E.C. 46, 53 (1994) (a defect in an administrative pleading can be remedied if the record demonstrates that the respondent understood the issues and had an adequate opportunity to justify his conduct). Thus, the Fiero Respondents have not been prejudiced by the Hearing Panel's extortion finding.

We reject the Fiero Respondents' arguments regarding constructive amendment of the complaint.

* * * *

We find that NASD afforded the Fiero Respondents procedural fairness in this proceeding, [*109] in accordance with the Exchange Act and NASD Procedural Rules, and we reject each of the Fiero Respondents' arguments regarding procedural irregularities.

III. SANCTIONS

The Hearing Panel expelled Fiero Brothers, barred Fiero from associating with any member firm in any capacity, fined the Fiero Respondents $ 1,000,000 (jointly and severally), and assessed hearing costs. We affirm the sanctions and costs. n60

n60 The Hearing Panel expressly stated that it had imposed sanctions based on the violations as a whole and that it had not imposed separate and distinct sanctions for each of the two causes of action. Consistent with NAC precedent, we have determined to impose distinct sanctions for the separate violations under causes one and two. Under cause one, market manipulation, we impose a joint and several fine of $ 1,000,000, bar Fiero, and expel Fiero Brothers. Under cause two, affirmative determination violations, we bar Fiero and expel the Firm.

Turning first to NASD's Sanction Guidelines, we note that there is no Sanction Guideline for the type of market manipulation involved in this case. The guideline applicable to the Fiero Respondents' violation of NASD affirmative [*110] determination requirements is the short sale violation guideline, which recommends a range of monetary sanctions and indicates that, in egregious cases, a bar or expulsion may be appropriate. See NASD Sanction Guidelines (2001 ed.) at 70 (Short Sale Violations).

We also have considered the principal considerations for determining sanctions listed in the Sanction Guidelines

and have concluded that the Fiero Respondents' violations are egregious and deserving of significant sanctions. The Fiero Respondents engaged in numerous acts of misconduct that continued for nearly two months. Over the course of January and February 1995, the Fiero Respondents colluded with others to execute numerous short sales of securities that they knew could not be borrowed for delivery and ultimately manipulated the markets for those securities. The Fiero Respondents attempted to conceal their misconduct and offered false and inconsistent explanations of their actions. Their misconduct wreaked havoc on the market for Hanover securities and ultimately caused or, at the least, greatly contributed to the demise of Hanover and its clearing firm. Although the record does not provide exact figures with respect [*111] to the Fiero Respondents' profit from their misconduct, the record indicates that the Fiero Respondents' gains from the first stage of the bear raid alone exceeded $ 550,000. n61 Additionally, we know from the type of violations involved that their misconduct harmed other market participants. Furthermore, the Fiero Respondents acted intentionally and in accordance with a concerted course of conduct designed to drive down the price of Hanover securities. They sold securities that they knew that they could not borrow, and they acted with others to manipulate the market for numerous securities.

> n61 The record contains somewhat unclear information regarding exactly how much the Fiero Respondents made on the market manipulation of Hanover securities. For this reason, we were not able to order the Fiero Respondents to disgorge their exact profits. We were able, however, to determine that the Fiero Respondents generated a significant profit for themselves in stage one alone. In our view, the magnitude of the Fiero Respondents' market manipulation justifies the fine of $ 1,000,000 that we impose.

We conclude that the Fiero Respondents' misconduct violated the public trust and jeopardized [*112] market integrity. In light of the egregiousness of the Fiero Respondents' misconduct, Fiero's lack of remorse, and his failure to acknowledge the nature of his actions, we find that it is in the public interest to bar Fiero from the securities industry and expel Fiero Brothers from NASD membership, in order adequately to protect the public from recurrence of similar misconduct. n62

> n62 The sanctions are consistent with the NASD Sanction Guidelines.

Accordingly, we fine the Fiero Respondents $ 1,000,000, jointly and severally; bar Fiero from associating with any NASD member in any capacity; expel Fiero Brothers from NASD membership; affirm the Hearing Panel's imposition of joint and several costs of $ 10,809.25; and impose appeal costs of $ 1,441.05 per respondent. The bar and expulsion are effective upon service of this decision. n63

> n63 We also have considered and reject without discussion all other arguments advanced by the Fiero Respondents.

> Pursuant to NASD Procedural Rule 8320, any member that fails to pay any fine, costs, or other monetary sanction imposed in this decision, after seven days' notice in writing, will summarily be suspended or expelled from membership for non-payment. Similarly, the registration of any person associated with a member who fails to pay any fine, costs, or other monetary sanction, after seven days' notice in writing, will summarily be revoked for non-payment.

[*113]

On Behalf of the National Adjudicatory Council,

Barbara Z. Sweeney

Senior Vice President and Corporate Secretary

1097FD

```
********** Print Completed **********

Time of Request: Thursday, July 24, 2008  13:59:00 EST

Print Number:    1843:105022141
Number of Lines: 1459
Number of Pages: 35
```

```
Send To:  NN/L, 107VJQ
          FINANCIAL INDUSTRY REGULATORY AUTHORITY
          1735 K ST NW
          WASHINGTON, DC 20006-1516
```